**Louis EZE, Petitioner–Appellant,**

v.

**Daniel A. SENKOWSKI, Superintendent, Clinton Correctional Facility, Respondent–Appellee.**

**Docket No. 99–2261.**

United States Court of Appeals, Second Circuit.

Argued: Dec. 10, 2002.

Decided: Feb. 12, 2003.

Brian Sheppard, New Hyde Park, NY, for Petitioner–Appellant.

Joseph Kilbridge, Assistant District Attorney (Frank J. Clark, District Attorney, Erie County, J. Michael Marion, Assistant District Attorney, on the brief), Buffalo, N.Y., for Respondent–Appellee.

Before: OAKES, CABRANES, KATZMANN, Circuit Judges.

KATZMANN, Circuit Judge.

The sexual abuse of children is heinous beyond words. It is intolerable as it is reprehensible. For that reason, justice demands that the perpetrators of such conduct be prosecuted to the fullest extent of the law, and that the penalties be appropriately severe for those whose actions are so destructive of young lives.

The prosecution of child sexual abuse cases is challenging. With third-party witnesses often unavailable, these cases frequently hinge on judgments about credibility in which jurors must choose between contradictory stories proffered by the defendant and the complainants. Just as the complainants are entitled to effective advocacy, so too are those charged, especially given the consequences of conviction. Thus, we have underscored the importance of effective representation for defendants in child sexual abuse prosecutions. *See generally Pavel v. Hollins*, 261 F.3d 210 (2d Cir.2001); *Lindstadt v. Keane*, 239 F.3d 191 (2d Cir.2001). The teaching of the law in this Circuit is that defense counsel is obliged, wherever possible, to elucidate any inconsistencies in the complainant's testimony, protect the defendant's credibility, and attack vigorously the reliability of any physical evidence of sexual contact between the defendant and the complainant.

Once again, before us now is someone convicted of child sexual abuse related crimes whose quality of trial representation causes us serious concern. Petitioner-appellant Louis Eze ("Eze") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 vacating his conviction in New York Supreme Court, Erie County, of multiple counts pertaining to the alleged sexual abuse of his distantly-related nieces, twin girls by the names of Chendo and Nnedi Okongwu. Eze was convicted almost entirely based on the girls' allegations at trial, supplemented with expert testimony substantiating their credibility and medical evidence suggesting that the girls may have been victims of sexual assault. Although defense counsel performed competently in certain respects, various apparent omissions of Eze's counsel leave us troubled. Several obvious pieces of evidence that would have cast doubt upon Eze's guilt were inexplicably neglected at trial, even though defense counsel was aware of them and their admissions apparently would not have interfered with the defense's overall strategy. Further, virtually all the testimony that linked Eze to the crime related to the omissions to which we refer.

Eze, of course, faces the heavy burden of showing ineffective assistance set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), enhanced by the added hurdle posed by the highly deferential review accorded state court adjudications under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (1996) (codified at 28 U.S.C. § 2254(d)(1) (2000)). Notwithstanding these obstacles, if certain omissions cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness, we would find the quality of representation sufficiently deficient to grant the writ. With the record before us, however, we lack the benefit of an explanation of Eze's trial counsel's reasoning and cannot conclude now that no plausible trial

strategy justified her actions. *See Sparman v. Edwards,* 154 F.3d 51, 52 (2d Cir. 1998) (stating that "a district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs"); *see also Bloomer v. United States,* 162 F.3d 187, 194 (2d Cir.1998) (same). We therefore vacate the District Court's denial of a writ of habeas corpus and remand for an evidentiary hearing at which Eze's trial counsel be allowed to explain her trial strategy. The District Court then should determine whether such strategy can justify those omissions.

## BACKGROUND

### A. Eze's State Trial

Dominic Okongwu ("Okongwu"), Eze, and Joy Wosu ("Wosu") were indicted by an Erie County Grand Jury on 68 counts related to the alleged sexual abuse of Chendo and Nnedi Okongwu. The three defendants were tried together in a seven day trial that commenced on November 12, 1993. Except as otherwise noted, the evidence adduced at trial established the following.

Okongwu and his wife are Nigerian citizens with twin daughters, Chendo and Nnedi, who were born on September 12, 1984. At some point after Okongwu's wife became ill and returned to Nigeria, Chendo and Nnedi were placed under the foster care of Ms. Ollie McNair ("McNair"). In December 1990, a Family Court judge appointed Eze to supervise Okongwu's weekend visitation of his daughters.[1] The court order required Eze to be in the girls' presence during the entirety of their visits with Okongwu and never to leave the girls unsupervised. The visits continued regularly every weekend until December 1991, at which time all contact between Okongwu and his daughters was terminated.

On December 12, 1991, McNair entered the girls' bedroom and found Nnedi lying on top of Chendo in a manner imitative of sexual contact. When McNair asked the girls what they were doing, Nnedi responded that "she was doing it because that's the same thing their father does to her when she goes to his house." McNair notified Child Protective Services, which commenced an investigation, and McNair received explicit instructions to keep Okongwu away from the children. At this point, the girls made no mention to McNair of Eze's involvement in any sexual abuse.

At trial, the girls testified to three instances of sexual abuse, with each incident bearing striking similarities.[2] The first occasion occurred in June 1991, following a community celebration known as the Juneteenth Festival. The girls testified that Eze picked them up at their foster home, and brought them to the festival with Okongwu and Wosu. On direct examination, both girls recalled that after the festival they returned to Okongwu's house; Eze and Wosu then left, at which point Okongwu, now alone with the girls, sexually abused them in his basement. On cross examination, however, Chendo testified that Eze and Wosu remained in Okongwu's house during the sexual abuse and that

---

1. Although the girls refer to Eze as "Uncle Louis," the precise familial relationship between Eze and the Okongwus is murky and seems quite distant. Okongwu explained that "the mother to [Eze's] mother is my father's sister." According to Eze, "Okongwu is more like a second cousin removed. He is a brother to my grandmother's half brother's son."

2. Chendo and Nnedi were nine years old when they testified at trial.

they came downstairs at one point. According to Chendo, Okongwu instructed them to shower and go downstairs to the basement and wait for him. The girls testified that, upon joining them, Okongwu directed Chendo to lie down on two mattresses that he had placed together, while he bound Nnedi by tying her arms and waist to a chair and taping her mouth shut. Both girls stated that, with Nnedi restrained, Okongwu inserted his penis into Chendo's vagina and forced Chendo to perform fellatio on him. The girls testified that Okongwu then had the girls switch roles. They said that Okongwu untied Nnedi and untaped her mouth, and bound Chendo to the chair in the same manner he had restrained her sister. The girls stated that Okongwu at this point engaged in oral sex and then intercourse with Nnedi. Afterwards, Okongwu instructed them, "you better not tell or I'll kill you," while brandishing a knife, belt, and scissors.[3] According to the trial testimony, Okongwu then told both girls, who were now bleeding, to take a shower. Eze later brought the girls back to McNair's home. Chendo said she did not tell McNair about the abuse because she was scared that her father would kill her if she did.

The second incident about which the girls testified occurred on or about September 12, 1991, the date of their seventh birthday. According to the girls, Eze picked them up from McNair's house and, after stopping off at Okongwu's house, they attended a birthday party with Okongwu and Wosu at Okongwu's friend's house. Similar to the June 1991 incident, Okongwu, Eze, Wosu, and the girls went to Okongwu's house following the party. Upon arrival, Okongwu told the girls to

get undressed and go downstairs to the basement. Chendo testified that Eze remained upstairs talking on the telephone and saw her walking downstairs naked. Nnedi, however, testified that Eze and Wosu left the house, leaving them alone with their father. The girls stated that Okongwu soon came downstairs, naked, and what followed mirrored the June 1991 incident. Okongwu again arranged the mattresses next to each other and engaged in coerced sexual acts with his daughters. Chendo testified that he first told her to lie down, while he tied Nnedi to a chair and taped her mouth. Okongwu proceeded to have sexual intercourse and oral sex with Chendo, ignoring her pleas for him to stop. Chendo testified that she then switched roles with her sister, as Nnedi was forced to have sexual intercourse and oral sex with Okongwu, while Chendo was bound. Chendo recalled that her father again threatened them, stating, "you better not tell or I'll kill you." Nnedi testified to similar events, but according to Nnedi, her father first had sexual intercourse and oral sex with her, while her sister was bound, and then the girls switched roles. Nnedi also testified that her father again told her that if she were to tell anyone what happened, he would kill her. The testimony indicated that the girls again showered, at Okongwu's instruction, and then had a birthday cake with Eze and Wosu. Eze returned the girls to McNair's home that evening. Nnedi explained that she did not tell McNair about what happened because she was scared of her father.

The final incident of abuse adduced at trial occurred in November 1991 during Thanksgiving. This time Okongwu joined

---

3. The girls recalled that their father would store his knife, belt, and scissors in a box he kept in the basement. A search of Okongwu's residence executed on February 19, 1992 by the Buffalo Police Department failed to produce these items, however. . The defense also brought out that the police never had Okongwu's mattresses tested for forensic evidence of sexual activity.

Eze to pick up the girls, and they brought the girls for Thanksgiving dinner to Okongwu's house, where Wosu joined them. This occasion, however, bears a critical distinction from the previous incidents in that both girls testified that Eze and Wosu participated in the actual sexual abuse. The girls stated that Okongwu instructed them to undress and wait for him in the basement. Chendo said that Eze, Wosu, and Okongwu, who were naked, joined the girls in the basement. Chendo testified that, as Nnedi was tied up with her mouth taped, Eze had sexual intercourse with her as the others watched.[4] Wosu then "tried to stick her private into our private very deep" and put her hands into Chendo's vagina. Finally, Okongwu had sexual intercourse with Chendo, while Wosu cheered him on, encouraging him to "go deeper." Once again, the girls switched roles. Chendo stated that she was bound with her mouth taped, and the three now abused Nnedi. Chendo recalled that Okongwu first had sexual intercourse with Nnedi and forced her to perform oral sex. Wosu then put "[h]er vagina in [Nnedi's] private" and then placed her hand in her vagina. Chendo testified that Eze followed by engaging in sexual intercourse and oral sex with Nnedi. Nnedi's recollection of the events varied slightly. Nnedi recalled that her father first forced her to have sexual intercourse and oral sex with him. Nnedi testified that Eze also had sexual intercourse with her and Wosu used her hand to touch Nnedi's vagina. Nnedi said that she was screaming as this transpired, and that Eze told her that if she revealed what happened, they would kill her. Nnedi testified that her sister was then abused by the three defendants.

First, she said that Okongwu had sexual intercourse and oral sex with Chendo. Nnedi testified that Eze next had sexual intercourse and oral sex with Chendo, and then Wosu put her hand in Chendo's vagina. Both girls indicated that following this incident they were bleeding and went upstairs to wash up.

The prosecution also offered evidence that Okongwu threatened the girls after they came forward with allegations of abuse. Chendo testified that, in October 1992, well after they had informed McNair of the abuse and the investigation had commenced, Okongwu would come to their bus stop and threaten them, saying "you better not tell or I'll kill you." According to Chendo, these threats occurred at least three or four times. After the girls informed McNair of these threats, McNair contacted the Board of Education and requested their bus stop be switched.

The prosecution's only physical evidence of sexual abuse came from Dr. Stephen Lazoritz.[5] Dr. Lazoritz examined both girls on January 6, 1992 and found evidence of sexual abuse. Dr. Lazoritz's conclusions relied heavily on the girls' abnormal and attenuated hymens. Dr. Lazoritz explained that, in children their age, the hymenal opening should be no more than seven millimeters. Both Chendo and Nnedi, however, had hymenal openings that measure nine millimeters by five millimeters. With regard to Chendo, Dr. Lazoritz found that she had less hymen tissue than would be expected, demonstrating that some hymen membrane had eroded away. Dr. Lazoritz also found scar tissue on Chendo's hymen at the six o'clock posi-

---

4. On cross examination, defense counsel attempted to elicit some inconsistent statements that Chendo had made to Detective Marcia Scott of the Buffalo Police Department concerning this incident.

5. McNair, who had received four or five years of training in detecting sexual abuse, did not testify that she saw any indications that the girls had been abused.

tion, which suggests injury from penetration or attempted penetration, as well as a band of scar tissue at the seven o'clock position. Dr. Lazoritz concluded "beyond a reasonable degree of medical certainty that [Chendo] was sexually abused. In fact, based on these findings, I can diagnose that sexual abuse had occurred [independent of an allegation of such abuse]." Dr. Lazoritz was less certain that Nnedi had been sexually abused and concluded that "[i]f Nnedi made a statement that she was sexually abused, I would say, with a reasonable degree of medical certainty, that these findings were consistent with that abuse."

On cross examination, Dr. Lazoritz agreed that his findings could have been caused by trauma other than sexual abuse and that the girls' throat cultures revealed nothing abnormal. In addition, Dr. Lazoritz acknowledged that, when he examined the children in January 1992, Child Protective Services had informed him that there was an allegation of sexual abuse. The most critical point elicited during Dr. Lazoritz's cross examination was that he had examined Chendo in 1988, at which point he made findings regarding her attenuated hymen and scar tissue similar to those he made in January 1992. This line of questioning raised the serious possibility that Chendo's abnormally large hymenal opening in 1992 existed prior to the alleged abuse in 1991. Because of the similarities between his 1992 findings and his 1988 findings, Dr. Lazoritz could not state with any degree of certainty that Chendo had been sexually abused at any time after 1988. Although Eze's counsel also attempted to question Dr. Lazoritz on Nnedi's medical records from 1988, the trial judge refused to allow counsel to elicit this testimony, sustaining the prosecution's objection that Eze's counsel was "doing this through the wrong witness." The defense never revisited the issue of Nnedi's 1988 medical records.

Jan Henry, the Director of Program Services for Child and Adolescent Treatment Services, testified for the prosecution as an expert witness on the psychology of child sexual abuse. Henry's testimony provided a backdrop against which the jury could assess the children's testimony and account for changes in their stories over time. Prior to trial, the defense expressed concern regarding Henry's expert testimony because she had been involved in a 1988 Family Court proceeding with the Okongwu family and had interviewed the girls after the 1991 allegations of abuse. The prosecutor represented to the trial court that Henry's testimony would be limited to explaining child sexual abuse syndrome "without in any way assessing the believability of Nnedi and Chendo Okongwu in this trial." The court agreed, limiting Henry's testimony to the behavioral characteristics of children that have been sexually abused. The jury therefore did not learn about Henry's interviews with the girls, including the girls' statement to Henry that they wanted to see Eze so they could ask Eze whether he knew "what our father did to us."

Henry discussed child sexual abuse syndrome, a theory that describes a series of phases experienced by a sexually abused child, including a child's behavior during abuse and after the abuse has ended. Henry explained that as the abuse continues to progress, a child begins to realize that something is wrong, and therefore the abuser often takes measures to insure that the victim will not tell anyone, often through threats, bribes, or brute force. A victimized child, Henry stated, may seem happy on the outside as a defense mechanism, and often seems to allow abuse to continue because of his or her powerless position. Consequently, according to Hen-

ry, a child will keep the abuse private until, for some reason, the secret is broken. Henry testified that a child may disclose accidentally because, for example, the child may "start doing things with other kids, repeating the behavior that they have experienced, and someone sees it and says how is it that you learned this, why are you doing this, and then they'll disclose what's happened to them." After this initial disclosure, however, the child may again suppress the abuse upon realizing that undesirable consequences arise following disclosure, such as being forced to retell the story many times or causing family disharmony. Henry also explained the reasons why a child may provide inconsistent, yet reliable, stories of the abuse. If a child's story is too consistent, it may have been memorized or programmed. In addition, a young child may initially only disclose part of the abuse as a test to gauge the reaction, and if the partial story receives a positive reaction, the child may then disclose more. Henry also discussed her assessment program for determining the veracity of a child's allegation of abuse. She testified, without objection from the defense, that out of approximately fifty-to-one hundred cases, she has encountered only one instance of a false allegation.[6]

On cross examination, Henry acknowledged that a child's mental process could change the facts surrounding the abuse and add people who were not actually there. She recounted a case in which the child stated that his or her parents were present during the abuse; it was later determined, however, that the child's parents had not in fact been present, but instead the child wished that they had been. Henry agreed that it is possible that a child's story could be influenced by adults and that, although therapists have

methods to control an adult's input, "you can only surmise, you don't know for sure." Henry also acknowledged that her evaluation relies on medical examinations and that the accuracy of her evaluation would be compromised if the medical information proved to be flawed. She admitted as well that the child sexual abuse syndrome study on which she relied during direct examination has been the subject of criticism because it was based on a small sample size. Finally, Henry was cross-examined on her statement that only one out of the fifty-to-one hundred cases she has worked on involved a false allegation. In the other cases, there were no judicial rulings establishing that the children told the truth.

The defense case consisted of the testimony of Wosu, Eze, Okongwu, Andrew Greenlee (Wosu's fiancé), and character witnesses. Wosu, an acquaintance of Eze's, testified that she met Okongwu, Chendo, and Nnedi in 1991 at Nigerian Association meetings. Wosu denied being with the children during the alleged incidents that occurred in June 1991 and November 1991. She explained that she attended the Juneteenth Festival in 1991, but did not go with Okongwu, Eze, Chendo, and Nnedi. Wosu also stated that she did not go to Okongwu's house for Thanksgiving, but instead had dinner with her fiancé that evening. Wosu testified that she was with the children on their seventh birthday in September 1991, but they only went to a restaurant to celebrate. Wosu also stated that she had only been to Okongwu's house on one occasion, October 26, 1991.

Eze testified to his supervision of the children during Okongwu's visitation. Eze said that, pursuant to the Family Court order, he never left Okongwu alone with the children during his supervision. Eze

---

**6.** The defense did successfully object, however, when the prosecution attempted to elicit information on the details of that one instance.

recalled that he and Okongwu took the girls to the Juneteenth Festival in June 1991. Although Wosu did not come with them to the festival, Eze testified that she also may have been there. Regarding the September 1991 incident, Eze testified that there was not a party for the girls' birthday; instead he, Okongwu, and Wosu took the girls to a restaurant. After eating, he returned the girls to McNair's. For Thanksgiving in 1991, Eze brought the girls to Okongwu's house for dinner, but Wosu was not present. Eze testified that the girls remained under his surveillance throughout the day, and did not think that Okongwu ever went down to the basement.

On cross examination, the prosecution brought out inconsistencies in Eze's statements following his arrest regarding Wosu's presence with the children. After being arrested, Eze supposedly stated that Wosu was with the girls several times, but on direct Eze testified that Wosu was with them only once. The prosecution also stressed the long and late hours that Eze worked in 1991, implying that he needed to sleep during the day on the weekends when he was charged with supervising Okongwu's visitation. Eze, however, maintained that he could adequately supervise the children on three hours of sleep. Finally, the prosecution impeached Eze's credibility by suggesting that Eze had lied on his application to become a naturalized citizen in 1990 when he stated that he had lived in the same residence with his wife for three years. The prosecution referred to an affidavit from his wife, filed with the Immigration and Naturalization Service ("INS"), swearing that Eze moved out in December 1987 and that they had not lived together since. Eze responded that his wife's statement was not true, and that although he had moved out of the house after they had a fight, he moved back for a while.

Okongwu substantiated Wosu and Eze's testimony. Okongwu explained that in 1991, he would see his daughters by having Eze pick them up from McNair's home. Okongwu testified that he and Eze brought the girls to the Juneteenth Festival in 1991. Wosu did not come with them, although Okongwu recalled seeing her at the festival. Okongwu explained that they took the girls back to the foster home immediately after the festival. As to the September 1991 incident, Okongwu testified that Eze picked up his daughters from the foster home and brought the girls to his house. Afterwards, Okongwu and Eze picked up Wosu, and they all went to a restaurant. Like Eze, Okongwu denied attending the party the girls mentioned and ever being in his basement alone with the girls. Okongwu also explained that he did not know the location of the girls' bus stop and that he worked the day shift, suggesting that it would have been impossible for him to threaten the girls while they were waiting for their bus. On cross examination, Okongwu said that he had no idea why his daughters would hold a grudge against him and fabricate their allegations. In addition, the prosecution brought out that his apartment was not searched until two months after he learned of the allegations, suggesting that he had the opportunity to remove the box containing the knife, belt, rope, and tape.

The remaining witnesses sought to enhance the credibility of the defendants. Greenlee, Wosu's fiancé, testified the he was visiting Wosu on Thanksgiving 2001 and produced an airplane ticket for his trip. Greenlee offered an alibi for Wosu, claiming they were eating dinner that evening when the alleged abuse occurred. On cross examination, the prosecution stressed Greenlee's bias in testifying on behalf of his fiancé and questioned his lack of a dinner receipt. Moreover, although Greenlee found out about the charges

against Wosu in December 1992, he did not contact the police regarding her alibi and first came forward at trial. In addition, two character witnesses testified to Okongwu and Eze's good reputation in the Nigerian community.

On November 26, 1993, the jury found the defendants guilty on all remaining charges.[7] Eze was convicted of eight counts of rape in the first degree, N.Y. Penal L. §§ 20.00, 130.35[1], [3], eight counts of sodomy in the first degree, *id.* §§ 20.00, 130.50[1], [3], four counts of incest, *id.* §§ 20.00, 255.25, six counts of sexual abuse in the first degree, *id.* §§ 20.00, 130.65[1], [3], and four counts of endangering the welfare of a child, *id.* §§ 20.00, 260.10[1]. Eze was sentenced to an aggregate prison term with a minimum of 35⅔ years and a maximum of 107 years.

## B. State Appeal

Eze appealed his conviction on numerous grounds. On July 14, 1995, the Appellate Division, Fourth Department, affirmed Eze's conviction and concluded, as relevant for our purposes, that "[t]he record does not support the contentions of the defendant that ... he was denied effective assistance of counsel." *People v. Eze,* 217 A.D.2d 987, 631 N.Y.S.2d 268, 268 (4th Dep't 1995). The Appellate Division did not discuss the merits of Eze's ineffective assistance claim and cited only the New York Court of Appeals decision, *People v. Baldi,* 54 N.Y.2d 137, 444 N.Y.S.2d 893, 429 N.E.2d 400 (1981). *Eze,* 631 N.Y.S.2d at 268. The New York Court of Appeals denied Eze leave to appeal on September 26, 1995. *People v. Eze,* 86 N.Y.2d 841, 634 N.Y.S.2d 451, 658 N.E.2d 229 (1995) (Table).

In June 1996, Eze moved in Erie County Court to vacate his conviction, or in the alternative to set aside his sentence, again raising a claim of ineffective assistance. Because the claim already had been decided·on the merits by the Appellate Division on direct appeal, the court was required to deny the motion under New York criminal procedure law. *See* N.Y.Crim. Proc. Law § 440.10[2] (McKinney 2002) ("[T]he court must deny a motion to vacate a judgment when: (a) The ground or issue raised upon the motion was previously determined on the merits upon an appeal from judgment, unless since the time of such appellate determination there has been a retroactively effective change in the law controlling such issue ...."). The Appellate Division, Fourth Department, denied Eze leave to appeal on January 6, 1997. Eze also applied to the Appellate Division, Fourth Department, for a writ of error coram nobis, arguing ineffective assistance of appellate counsel. The Appellate Division rejected this application on September 30, 1997.

## C. Federal Habeas Proceedings

In April 1997, Eze filed a petition for a writ of habeas corpus in the Western District of New York (William M. Skretny, *Judge*) claiming ineffective assistance of counsel. In his memorandum of law supporting his petition, Eze detailed approximately twenty allegations of supposedly deficient trial counsel performance. The District Court denied Eze's petition on April 24, 1999. The court determined that many of Eze's allegations of ineffective assistance were "little more than 'second guessing' of counsel's strategic decisions, and/or criticism of aspects of counsel's performance that clearly had no impact on the outcome." As to the remainder of the allegations, the court found that only four

---

7. After the prosecution's case-in-chief, the prosecution consented to the dismissal of two counts of sexual abuse in the first degree, N.Y. Penal L. §§ 20.00, 130.65[1], [3].

merited discussion: 1) the decision not to object to Henry's expert testimony and the lack of an effective cross examination of Henry; 2) the failure to question Dr. Lazoritz on Nnedi's 1988 medical examination and failure to call the physicians who performed that examination; 3) the decision not to move to dismiss a juror who attended the same church as the children; and 4) the failure to object to questions regarding Eze's INS application and to the jury charge on prior bad acts. The District Court concluded that these allegations either lacked merit or were unlikely to have had any impact on the verdict. The District Court also rejected Eze's claim that he was denied effective assistance of appellate counsel.

On July 9, 2001, we granted a certificate of appealability on (1) whether there was a state court adjudication on the merits of Eze's federal ineffective assistance claim so as to trigger 28 U.S.C. § 2254(d)(1)'s standard of review, and (2) whether, under the applicable standard of review, Eze is entitled to habeas relief on his claim of ineffective assistance of trial counsel, with specific regard to trial counsel's failure to challenge the medical evidence consistent with *Lindstadt v. Keane*, 239 F.3d 191, 201 (2d Cir.2001). On July 9, 2001, we issued a supplemental certificate of appealability on whether the respondent has waived § 2254(d)(1)'s standard of review.

### DISCUSSION

█ We review *de novo* the District Court's denial of Eze's petition for a writ of habeas corpus. *See Ryan v. Miller*, 303 F.3d 231, 245 (2d Cir.2002).

### I. The Standard of Review of the State Court Decision

AEDPA changed the landscape of federal habeas corpus review by "significantly curtail[ing] the power of federal courts to grant the *habeas* petitions of state prisoners." *Lainfiesta v. Artuz*, 253 F.3d 151, 155 (2d Cir.2001), *cert. denied*, 535 U.S. 1019, 122 S.Ct. 1611, 152 L.Ed.2d 625 (2002); *see also Bell v. Cone*, 535 U.S. 685, 122 S.Ct. 1843, 1849, 152 L.Ed.2d 914 (2002) (noting that AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law"). Under AEDPA,

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (2000). In an apparent attempt to elude the heavy burden AEDPA presents, Eze makes two arguments for why § 2254(d)(1)'s deferential standards should not apply. First, Eze contends that the respondent waived the standards by failing to raise them in the District Court. Second, Eze argues that the Appellate Division merely adjudicated his ineffective assistance claim under state law, and therefore did not adjudicate his federal claim on the merits so as to trigger § 2254(d)(1).

### A. Whether § 2254(d)(1)'s Standard of Review Was Waived

Eze maintains that the respondent waived the statute's standard of review by

failing to reference the standard in its papers before the District Court. Eze therefore urges us to apply the pre-AED-PA *de novo* review of a state court adjudication. *See Pavel v. Hollins*, 261 F.3d 210, 215 (2d Cir.2001) ("Under [pre-AEDPA law], pure questions of law are reviewed *de novo*, as are mixed questions of law and fact; state court factual findings are presumed correct absent certain circumstances.") (internal citations, quotation marks, and alterations omitted). The gravamen of Eze's waiver argument is that procedural defenses can be waived if not raised by the defendant.

■ AEDPA's standard of review, however, is not a procedural defense, but a standard of general applicability for all petitions filed by state prisoners after the statute's effective date presenting claims that have been adjudicated on the merits by a state court. *See Brown v. Artuz*, 283 F.3d 492, 498 n. 2 (2d Cir.2002) ("AED-PA's standards for reviewing state court findings and conclusions apply to any petition filed … after April 24, 1996, the AEDPA's effective date."); *Mancuso v. Herbert*, 166 F.3d 97, 101 (2d Cir.1999) (stating that "AEDPA is applicable to all petitions filed after its effective date"), *cert. denied*, 527 U.S. 1026, 119 S.Ct. 2376, 144 L.Ed.2d 779 (1999). The statute contains unequivocally mandatory language. *See* 28 U.S.C. § 2254(d) (instructing that a state prisoner's petition for a writ of habeas corpus "*shall not be granted* with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding") (emphasis added). Therefore, if the Appellate Division adjudicated Eze's federal ineffective assistance claim on the merits, we must apply AEDPA deference.

## B. Adjudication of Eze's Federal Claim on the Merits

Eze argues that the Appellate Division failed to adjudicate his claim on the merits because its decision cited the New York test for ineffective assistance from *People v. Baldi*, 54 N.Y.2d 137, 444 N.Y.S.2d 893, 429 N.E.2d 400 (1981), but failed to mention the federal test from *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See People v. Eze*, 217 A.D.2d 987, 631 N.Y.S.2d 268, 268 (4th Dep't 1995). According to Eze, because *Baldi* and *Strickland* set forth different tests for ineffective assistance, *see infra* II.A., the Appellate Division did not adjudicate his federal ineffective assistance claim.

■ AEDPA's deferential standard is limited to claims that were "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). If a state court has failed to adjudicate a claim on the merits, "we apply the pre-AEDPA standards, and review *de novo* the state court disposition of the petitioner's federal constitutional claims." *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir.2001) (citing *Washington v. Schriver*, 255 F.3d 45, 55 (2d Cir.2001)). To adjudicate a claim on the merits, the state court "need not mention the argument raised or cite relevant case law," *Brown*, 283 F.3d at 498, or even "explain[ ] its reasoning process," *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir.2001). Rather, a state court adjudicates a claim on its merits by "(1) dispos[ing] of the claim 'on the merits,' and (2) reduc[ing] its disposition to judgment." *Id.* at 312. Whether a claim has been disposed on its merits turns on:

" '(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits.' " *Id.* at 314 (quoting *Mercadel v. Cain,* 179 F.3d 271, 274 (5th Cir.1999)).

■ Since *Sellan,* "we have given a broad reading to state court dispositions." *Norde v. Keane,* 294 F.3d 401, 410 (2d Cir.2002). We have explained that the "state court need only dispose of the petitioner's federal claim on substantive grounds, and reduce that disposition to judgment. No further articulation of its rationale or elucidation of its reasoning process is required." *Aparicio,* 269 F.3d at 93–94. In fact, an issue may be considered to be adjudicated on its merits "even when the state court does not specifically mention the claim but uses general language referable to the merits." *Norde,* 294 F.3d at 410.

■ Eze alerted the Appellate Division to the federal nature of his claim by citing *Strickland* in his pro se supplemental brief. Therefore, the Appellate Division was apprised of Eze's federal claim and the governing federal law when it rejected Eze's ineffective assistance claim. The Appellate Division held that "[t]he record does not support the contentions of the defendant that ... he was denied effective assistance of counsel." *People v. Eze,* 631 N.Y.S.2d at 268. This language demonstrates that the Appellate Division disposed of the claim on substantive grounds. *See Aparicio,* 269 F.3d at 94 (concluding that the Appellate Division adjudicated the petitioner's claims on the merits because "there is nothing in its decision to indicate that the claims were decided on anything but substantive grounds"). Therefore, un-der *Sellan* and its progeny, the Appellate Division adjudicated Eze's federal ineffective assistance claim on the merits so as to trigger § 2254(d)(1)'s review.

## II. The Merits of Eze's Habeas Petition

### A. Whether the Appellate Division's Decision Was Contrary to Clearly Established Federal Law

■ Under AEDPA, a federal court shall issue a writ of habeas corpus if the state court adjudication "resulted in a decision that was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Eze argues that New York's standard for ineffective assistance of counsel, which the Appellate Division applied on direct appeal, is "contrary to" the federal framework set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Eze correctly identifies *Strickland* as establishing clear federal law on ineffective assistance of counsel, as required under AEDPA. *See Williams v. Taylor,* 529 U.S. 362, 390–91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.' "). We disagree, however, that New York's standard is "contrary to" *Strickland.*

The New York standard for ineffective assistance was announced in *People v. Baldi,* 54 N.Y.2d 137, 444 N.Y.S.2d 893, 429 N.E.2d 400 (1981). Under *Baldi,* "[s]o long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met."

*Id.* at 147, 444 N.Y.S.2d 893, 429 N.E.2d 400. The core of the *Baldi* standard is "whether [the] defendant received 'meaningful representation.'" *People v. Benevento,* 91 N.Y.2d 708, 674 N.Y.S.2d 629, 697 N.E.2d 584, 587 (1998). The New York Court of Appeals has explained that *Baldi*'s "meaningful representation" component includes a prejudice inquiry, "which focuses on the 'fairness of the process as a whole rather than [any] particular impact on the outcome of the case.'" *People v. Henry,* 95 N.Y.2d 563, 721 N.Y.S.2d 577, 744 N.E.2d 112, 114 (2000) (quoting *Benevento,* 674 N.Y.S.2d 629, 697 N.E.2d at 588).

To prevail under *Strickland,* a defendant must show that counsel's representation "fell below an objective standard of reasonableness" based on "prevailing professional norms" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 688, 694, 104 S.Ct. 2052. The *Strickland* Court defined a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. To prevail, a defendant must establish both of *Strickland*'s prongs because, otherwise, "it could not be said that the sentence or conviction 'resulted from a breakdown in the adversary process that rendered the result of the process unreliable,' and the sentence or conviction should stand." *Cone,* 122 S.Ct. at 1850 (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052).

New York courts have acknowledged that the *Baldi* standard for ineffective assistance is "somewhat different" from the *Strickland* test. *People v. Claudio,* 83 N.Y.2d 76, 607 N.Y.S.2d 912, 629 N.E.2d 384, 385–86 (1993); *see Henry,* 721 N.Y.S.2d 577, 744 N.E.2d at 114 ("This Court has previously recognized the differ-

ences between the Federal and State tests for ineffectiveness ...."). Whereas both tests contain a prejudice component, the touchstone of the New York test is "the fairness of the process as a whole," *Benevento,* 674 N.Y.S.2d 629, 697 N.E.2d at 588, while the federal test considers the outcome of the proceeding for the defendant, *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

With these two standards and their modest differences in mind, the determinative question becomes whether the Appellate Division rendered "a decision that was contrary to" the federal standard established in *Strickland.* 28 U.S.C. § 2254(d)(1). The Supreme Court has interpreted § 2254(d)(1)'s "contrary to" clause as permitting a federal court to "grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams,* 529 U.S. at 412–13, 120 S.Ct. 1495; *accord Cone,* 122 S.Ct. at 1850; *see Lainfiesta,* 253 F.3d at 155.

In fact, we need not look further than two of our recent decisions that addressed this precise issue. In *Lindstadt,* the Appellate Division, in denying the petitioner's appeal, similarly "d[id] not reference *Strickland;* instead, it relie[d] on a standard articulated in *People v. Baldi.*" 239 F.3d at 198. We held in *Lindstadt* that "[t]he standard applied by the state court [*i.e.,* the *Baldi* standard] is not 'diametrically different, opposite in character or nature, or mutually opposed' to the standard articulated in *Strickland.*" *Id.* (quoting *Williams,* 529 U.S. at 405, 120 S.Ct. 1495). We reached the identical conclusion in *Loliscio v. Goord,* 263 F.3d 178 (2d Cir.2001). In *Loliscio,* after the state court applied the same New York standard

for ineffective assistance, we determined that the standard was not "contrary to" *Strickland* under § 2254(d)(1). *Id.* at 192–93 (citing *Lindstadt,* 239 F.3d at 198).

Eze does not, and cannot, distinguish *Lindstadt* and *Loliscio,* but instead seems to speculate that those panels never seriously considered the question because there is no indication that the parties in those cases engaged in any adversarial testing of the issue. The fact remains, however, that both *Lindstadt* and *Loliscio,* which we are bound to follow, held that the *Baldi* test is not contrary to the *Strickland* test for purposes of § 2254(d)(1). *See United States v. Santiago,* 268 F.3d 151, 154 (2d Cir.2001) (instructing that we are compelled to follow the decisions of earlier panels unless they have "been called into question by an intervening Supreme Court decision or by one of this Court sitting *in banc*"), *cert. denied,* 535 U.S. 1070, 122 S.Ct. 1946, 152 L.Ed.2d 849 (2002); *accord In re Sokolowski,* 205 F.3d 532, 534–35 (2d Cir.2000) (per curiam).

## B. Whether the Appellate Division Unreasonably Applied Clearly Established Federal Law

Having concluded that Eze cannot prevail under AEDPA's "contrary to" clause, we now turn to whether the Appellate Division decision "involved an unreasonable application ... of clearly established Federal law, as determined by the Supreme Court" in *Strickland.* 28 U.S.C. § 2254(d)(1); *see Williams,* 529 U.S. at 390, 120 S.Ct. 1495 (stating that federal habeas petitions alleging ineffective assistance are governed by *Strickland* ).

The Sixth Amendment guarantees persons charged with crimes the "Assistance of Counsel." U.S. Const. amend. VI. "It has long been recognized that the right to counsel is the right to the effective assistance of counsel." *McMann v. Richard-*

*son,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (citations omitted). As discussed above, establishing ineffective assistance under *Strickland* entails showing that counsel's performance "fell below an objective standard of reasonableness," *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, and showing a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. 2052. "Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687, 104 S.Ct. 2052. Once both prongs are met, there is "sufficient indication that counsel's assistance was defective enough to undermine confidence in a proceeding's result." *Cone,* 122 S.Ct. at 1850.

AEDPA adds another hurdle in addition to the already heavy burden Eze faces under *Strickland. See Sellan,* 261 F.3d at 315. To prevail, Eze "must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly." *Cone,* 122 S.Ct. at 1852. Rather, Eze must show that the Appellate Division "applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Id.; see Sellan,* 261 F.3d at 315. We thus again turn to *Williams,* where the Supreme Court explained what it means for a state court to "unreasonabl[y] appl[y] ... clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1). Justice O'Connor, writing for the majority on this issue, stressed that "an *unreasonable* application of federal law is different from an *incorrect* applica-

tion of federal law." *Williams,* 529 U.S. at 410, 120 S.Ct. 1495. To determine whether federal law was unreasonably applied, "a federal habeas court ... should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495; *see Lainfiesta,* 253 F.3d at 155. Under this objective assessment of unreasonableness, a state court unreasonably applies established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 529 U.S. at 413, 120 S.Ct. 1495; *see Lainfiesta,* 253 F.3d at 155.

For a state court to unreasonably apply clearly established federal law under AEDPA, it is not enough that a federal court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411, 120 S.Ct. 1495; *accord Gilchrist v. O'Keefe,* 260 F.3d 87, 94 (2d Cir. 2001). Rather, "some increment beyond error is required." *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000). This increment, however, "need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* (internal quotation marks and citation omitted); *accord Aparicio v. Artuz,* 269 F.3d 78, 94 (2d Cir.2001).

The Appellate Division unfortunately did not enlighten us as to its reasoning for denying Eze's ineffective assistance claim, stating only that "[t]he record does not support the contentions of the defendant that ... he was denied effective assistance of counsel." *People v. Eze,* 217 A.D.2d 987, 631 N.Y.S.2d 268, 268 (4th Dep't 1995). We have held that "when a state court fails to articulate the rationale

underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an 'unreasonable application' of clearly established Supreme Court precedent." *Sellan,* 261 F.3d at 311–12; *accord Aeid v. Bennett,* 296 F.3d 58, 62 (2d Cir.), *cert. denied,* —— U.S. ——, 123 S.Ct. 694, 154 L.Ed.2d 641 (2002). We therefore engage in a review of Eze's counsel's performance at trial and ascertain whether the Appellate Division's decision could be reasonable under *Strickland.*

### 1. Acts and Omissions of Eze's Trial Counsel

Under *Strickland*'s first prong, counsel's conduct falls to the level of being deficient if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Our scrutiny of counsel's performance is "highly deferential" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after a conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689, 104 S.Ct. 2052. We therefore must make "every effort ... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Accordingly, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," which forces the defendant to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*

We also note that three defense attorneys, one for each defendant, jointly tried the case. We take into account the tactics of all three defense attorneys in assessing the reasonableness of Eze's counsel's performance. For example, Eze's counsel may have wisely decided not to repeat a line of questioning that had been pursued, or would be pursued, by Okongwu or Wosu's counsel. *See United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir. 1987) (reviewing criminal conviction involving multiple defendants and appellant's counsel was "close to last in the order of questioning by numerous defense counsel. Counsel might very well have felt that there was little need for additional probing by the time it was his turn to cross-examine, or even that cross-examination at that point might have been counterproductive."), *cert. denied,* 484 U.S. 1061, 108 S.Ct. 1018, 98 L.Ed.2d 983 (1988).

Eze alleges ineffective assistance at five points at trial. Eze's first three allegations pertain predominantly to the claimants' believability, while the final two relate to Eze's credibility. We review the merits of each of these allegations in turn, and then assess the cumulative effect of these alleged deficiencies.

### a. Challenges to Dr. Lazoritz's Medical Conclusions

Eze makes various allegations of ineffective assistance concerning Dr. Lazoritz's testimony. Dr. Lazoritz was a critical witness for the prosecution's case, as his testimony regarding his examinations of the girls and his subsequent medical conclusions enabled the jury to conclude that sexual activity occurred. This physical evidence corroborating the girls' allegations of abuse was particularly incriminating in this case, which largely came down to conflicting testimony from the defendants and the alleged victims as to whether abuse

occurred. *See Pavel v. Hollins,* 261 F.3d 210, 224 (2d Cir.2001) ("When a sex abuse case boils down to such a 'credibility contest,' physical evidence will often be important.").

First, Eze argues that his counsel failed to adduce evidence indicating that the findings made with respect to Nnedi's hymen in 1988 were similar to those made in 1992 by Dr. Lazoritz. After showing that Dr. Lazoritz's finding as to Chendo's hymenal attenuation were similar to those from his 1988 examination of Chendo, Eze's counsel questioned Dr. Lazoritz about Nnedi's 1988 medical examination. Eze's counsel asked Dr. Lazoritz whether he was aware that Nnedi had been examined by Dr. Hornberg at the Children's Hospital and then inquired about his findings regarding Nnedi's hymenal tissue. The prosecution objected "because she's doing this through the wrong witness. You can't ask this witness what someone else found with medical records that are not in evidence." The court sustained this objection, presumably because Dr. Lazoritz did not perform Nnedi's earlier examination. After Dr. Lazoritz testified that he did not have any recent discussions with Dr. Hornberg and was unaware whether Dr. Hornberg was still at the Children's Hospital, Eze's counsel moved on to a different topic and the defense did not revisit Nnedi's 1988 medical examination.

The evidence of Nnedi's 1988 examination was crucial because it would have cast doubt as to whether Nnedi's physical condition pre-existed the alleged abuse in 1991. The defense, however, did not introduce evidence of Nnedi's 1988 examination, either through the testimony of the physician who examined Nnedi in 1988 or through a certified copy of the medical report. This failure to introduce this evidence, without any plausible justification,

appears to be a significant dereliction by the defense.

Eze also contends that his attorney failed to bring out various inconsistencies in Dr. Lazoritz's testimony with respect to Chendo. Eze notes that whereas Dr. Lazoritz testified at trial that Chendo's 1992 findings were "diagnostic" of sexual abuse, his report merely stated that those findings were "consistent with" sexual abuse. Although it may have been preferable for Eze's counsel to pursue this line of questioning, the failure to do so does not rise to the level of deficient representation. "[T]he conduct of examination and cross-examination is entrusted to the judgment of the lawyer, and an appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken." *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir.1998); *see Nersesian*, 824 F.2d at 1321 ("Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are similarly strategic in nature."). Eze's counsel conducted a cross examination of Dr. Lazoritz that elicited several important points helpful to the defendant, including that other trauma could have caused the girls' condition, that Chendo's 1988 findings resembled those from 1991, and that Dr. Lazoritz had been informed that there was an allegation of sexual abuse prior to conducting his examination.

Eze next argues that his counsel failed to enlighten the jury about the extent to which the medical community had called into question the method used by Dr. Lazoritz to conclude that sexual abuse occurred. In particular, Eze notes that his counsel failed to bring out that medical child sex abuse experts were questioning the significance of enlarged hymenal openings. Closely related to this objection is Eze's claim that his counsel should have called a medical expert to rebut Dr. Lazoritz's methodology and conclusions.

We are especially concerned, in light of our holding in *Lindstadt*, with defense counsel's failure to impeach the underlying medical grounds on which Dr. Lazoritz based his conclusion that the girls had been abused. The defendant in *Lindstadt* was convicted of sexually abusing his young daughter based on the testimony of his daughter, his estranged wife, and two (one medical and one psychological) expert witnesses. 239 F.3d at 193. The medical expert offered testimony that carried probative strength comparable to that of Dr. Lazoritz's testimony. The expert in *Lindstadt* testified to his findings from a physical examination of the alleged victim; these findings were the only physical evidence the prosecution introduced. *Id.* at 201. The expert stated that his findings were indicative of sexual abuse, a conclusion he based on studies that were never introduced into evidence. *Id.* at 201–02. Because the defendant's counsel did not even request copies of these studies, he was unable to cross-examine the medical expert effectively on them. *Id.* Nor was there evidence that the defense contacted an expert of its own "either to testify or (at least) to educate counsel on the vagaries of abuse indicia." *Id.* at 201. Had counsel done so, he would have discovered a bevy of medical literature that called the expert's conclusions into doubt. *Id.* at 202. We thus concluded in *Lindstadt* that "counsel's failure to consult an expert, failure to conduct any relevant research, and failure even to request copies of the underlying studies relied on by [the expert] contributed significantly to his ineffectiveness." *Id.* We rejected arguments that counsel's cross examination was otherwise satisfactory, observing that the cross examination "was hamstrung by counsel's lack of familiarity with the studies upon which [the expert] was presumably rely-

ing." *Id.* "[T]he result was ruinous" because these studies supposedly ruled out any explanation for the physical findings other than abuse. *Id.*

In *Pavel*, we similarly determined that defense counsel's failure to call a medical expert to testify about the prosecution's physical evidence contributed significantly to our conclusion that the representation was constitutionally deficient. 261 F.3d at 223. The defendant in *Pavel* was accused of sexually abusing his seven and five year old sons. *Id.* at 211, 214. The prosecution's medical expert testified, based on her review of the records of the boys' physical examinations, that the physical findings were consistent with the boys' allegations that their father had anally sodomized them. *Id.* at 215. The expert, however, also testified that some of the findings could have been attributed to benign causes, such as diarrhea. *Id.* Defense counsel neither called a medical expert to rebut the prosecution's expert nor consulted an expert prior to trial. *Id.* at 223. We explained that the case boiled down to a "credibility contest" and that "when a case hinges all-but-entirely on whom to believe, an expert's interpretation of relevant physical evidence (or the lack of it) is the sort of 'neutral, disinterested' testimony that may well tip the scales and sway the fact-finder." *Id.* at 224.

We counseled in *Pavel* that, because of the particular importance of physical evidence in child sexual abuse cases that turn into credibility contests, "physical evidence should be a focal point of defense counsel's pre-trial investigation and analysis." *Id.* Moreover, "because of the 'vagaries of abuse indicia,' such pre-trial investigation and analysis will generally require some sort of consultation with an expert." *Id.* Consultation with an expert was crucial in *Pavel* for two reasons: 1) counsel had neither the education nor the experience

necessary to evaluate the evidence and "make for himself a reasonable, informed determination as to whether an expert should be consulted or called to the stand"; and 2) there was an "obvious, common-sense mismatch" between the physical evidence and the allegations such that a "reasonably professional attorney" would have consulted and been ready to call an expert to address the inconsistencies. *Id.* In light of these and other trial errors, we found counsel's performance to be deficient. *Id.* at 225–26.

A lesson to be learned from *Lindstadt* and *Pavel* is that when a defendant is accused of sexually abusing a child and the evidence is such that the case will turn on accepting one party's word over the other's, the need for defense counsel to, at a minimum, consult with an expert to become educated about the "vagaries of abuse indicia" is critical. *See id.* at 224; *Lindstadt,* 239 F.3d at 201. The importance of consultation and pre-trial investigation is heightened where, as here, the physical evidence is less than conclusive and open to interpretation.

It is undisputed that the defense did not question the basis for Dr. Lazoritz's conclusions and did not call a medical expert to testify. Indeed, there is no indication that counsel even consulted with an expert prior to trial. This is extremely troubling because, prior to trial, various questions had been raised in the medical community that could have been used to call Dr. Lazoritz's conclusions into doubt. Dr. Lazoritz partly based his conclusions on an examination of the girls' hymens, specifically focusing on measurements of their enlarged hymenal openings. Contemporaneous medical studies raised questions about the reliability of hymenal examinations as the basis for determining the occurrence of sexual abuse. *See, e.g.,* John McCann et al., *Genital Findings in Prepubertal Girls*

*Selected for Nonabuse: A Descriptive Study,* 86 Pediatrics 428 (1990) (finding that measurements of hymenal opening varied depending on hymenal type and child's position when measurements were conducted) (cited with approval in *Lindstadt,* 239 F.3d at 201); Astrid Heger & S. Jean Emans, *Introital Diameter as the Criterion for Sexual Abuse,* 85 Pediatrics 222 (1990) (noting growing concern over emphasis placed on measurements of hymenal opening to diagnose sexual abuse and noting various factors that can impact on the results of such measurements).

Defense counsel, however, failed to confront Dr. Lazoritz with these studies or delve into the various factors that might have impacted his findings. Counsel did not question the tools Dr. Lazoritz used to conduct the examination, but only suggested that Dr. Lazoritz may have read his ruler incorrectly when measuring the girls' hymenal openings. Eze's counsel's failure to confront Dr. Lazoritz with these or similar studies during cross examination calls into question the thoroughness of her pretrial investigation and preparation. It is particularly noteworthy that counsel did not refer to the medical literature to question the accuracy of Dr. Lazoritz's testimony that "[i]n the medical literature ... statements made by the child regarding their own sexual abuse have the most weight." If counsel failed to investigate the accuracy of Dr. Lazoritz's statements, she missed out on the chance to impeach him on contrary medical literature. We cannot tell from the record before us whether counsel consulted with an expert in the field who could have alerted her to these studies, but we note that counsel certainly would have been wise to do so. *See* Beth A. Townsend, *Defending the "Indefensible": A Primer to Defending Allegations of Child Abuse,* 45 A.F. L.Rev. 261, 297–98 (1998) (consulting expert "may assist the defense counsel to find areas the expert can testify about that are helpful to the defense. . . . [and] counsel then can minimize anything damaging said by the [prosecution's] expert on direct") (cited with approval in *Lindstadt,* 239 F.3d at 201).

Similarly, the defense could have called its own expert to undermine Dr. Lazoritz's conclusions. A defense counsel's decision not to call a particular witness usually falls under the realm of trial strategy that we are reluctant to disturb. *See Luciano,* 158 F.3d at 660. At the same time, however, the decision not to call a witness must be grounded in some strategy that advances the client's interests. *Pavel,* 261 F.3d at 218–19. In *Pavel,* for instance, we refused to excuse as trial strategy the trial counsel's failure to call certain witnesses because

> [counsel's] decision as to which witnesses to call was animated primarily by a desire to save himself labor-to avoid preparing a defense that might ultimately prove unsuccessful. [Counsel's] decision not to call any witnesses other than [the defendant] was thus "strategic" in the sense that it related to a question of trial strategy-which witnesses to call. And it was "strategic" also in that it was taken by him to advance a particular goal.

*Id.* at 218. Because this goal was "mainly avoiding work—not, as it should have been, serving [the defendant's] interests by providing him with reasonably effective representation," we determined that our usual hesitation to disturb such strategic decisions "ha[d] no bearing" in that case. *Id.* at 218–19. In the instant case, the record fails to suggest any plausible trial strategy to explain the defense's decision not to call an expert.

The respondent answers these arguments by stating that Dr. Lazoritz based

his conclusions on more than just measurements of the girls' hymenal openings and argues that a defense expert would have been unlikely to challenge his findings successfully. This argument falls short of the mark. Although Dr. Lazoritz's findings were not limited to measurements of the girls' hymenal openings and the jury may not have been persuaded by a defense expert, nevertheless the lack of a medical expert may have impeded counsel's ability to call Dr. Lazoritz's findings into question. *See Lindstadt,* 239 F.3d at 202. The respondent also argues that Eze's counsel elicited the important admission from Dr. Lazoritz that he could not say for certain that the abuse occurred in 1991. The effectiveness of cross examination, however, may have been severely hamstrung by counsel's possible lack of familiarity with the relevant medical literature. *See Id.* Morever, the fact remains that in the absence of a defense expert to challenge his findings, it was all but assured that Dr. Lazoritz's testimony would carry great weight with the jury.[8]

The respondent also contends that Eze's trial strategy was not that the children were never abused, but rather that Eze did not abuse them. Therefore, according to the respondent, calling a medical expert to refute Dr. Lazoritz's conclusions would have been immaterial to Eze's defense. This characterization of Eze's trial strategy, however, belies the record. In her opening statement, Eze's counsel stated

that even though there was an accusation of rape, "no effort [was] made to take these children the next day for a medical examination." Additionally, during her cross examination of Dr. Lazoritz, Eze's counsel elicited the testimony that the children's findings could have been caused by trauma other than sexual abuse. Eze's counsel also cross-examined Dr. Lazoritz as to whether the findings of his 1988 examination of Chendo were similar to those in 1992. Therefore, expert testimony refuting Dr. Lazoritz's conclusion that the girls' 1992 examination suggested sexual abuse would have been entirely consistent with Eze's defense.

### b. Challenges to the Cross Examination of Henry's Expert Testimony

Henry testified to traits commonly manifested in victims of child sexual abuse to aid the jury in assessing the credibility of the children's testimony and, in particular, in understanding why their stories may have changed over time. She also stated, without objection, her opinion that, of the fifty-to-one hundred alleged victims of child abuse she has assessed and treated, in only one instance did the child lie. Notably, however, Henry did not offer any opinion as to the credibility of Nnedi or Chendo, and did not testify to her prior contact with them.[9]

Eze makes two claims of ineffective assistance in connection with Henry's testi-

---

**8.** We also note that the jury may have been prone to lend considerable weight to Dr. Lazoritz's unchallenged methodology. Dr. Lazoritz was a seasoned expert witness who by his own count had testified over two hundred times in the twelve years preceding Eze's trial (all but twice on behalf of the prosecution).

**9.** On December 20, 1991, Child Protective Services referred the girls to Henry for assessment of their sexual abuse allegations. After interviewing Chendo, Nnedi, and McNair, Henry arrived at the initial conclusion that

Okongwu's visitation should cease because "the materials presented thus far warrants serious concern about the safety and protection of these girls during visits with Mr. Okongwu." In Henry's subsequent interviews with the girls, she learned the details of Okongwu's alleged sexual abuse. In a written report prepared based on these interviews, Henry concluded that "the allegations made by Chendo and Nnedi are reports of events they actually experienced."

mony. First, Eze contends that his counsel should have objected to Henry's testimony that she had encountered only one incident of a child falsely alleging sexual abuse in the course of the fifty-to-one hundred cases on which she has worked. Eze argues that this testimony "was designed merely to prejudicially indicate that the complainants' allegations were true and to bolster their credibility, thereby intruding upon the jury's province to assess their credibility." The District Court acknowledged that this testimony "indirectly related to [the] witness' honesty," but concluded that it was tempered by Henry's statements explaining "why it is sometimes difficult to discern the accuracy of children's statements."

Henry's expert testimony on the behavioral patterns of sexually abused children was admissible under New York law. Experts may testify to matters that "would help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror." *People v. Taylor*, 75 N.Y.2d 277, 552 N.Y.S.2d 883, 552 N.E.2d 131, 135 (1990) (citation omitted). Because the dynamics of sexual abusive relationships are not familiar to the average juror, New York courts permit experts to explain the reactions of young victims of sexual abuse. *Id.* at 135–36; *People v. Cintron*, 75 N.Y.2d 249, 552 N.Y.S.2d 68, 551 N.E.2d 561, 572 (1990). New York courts have explained that child sexual abuse syndrome "is a recognized diagnosis based upon comparisons between the characteristics of individuals and relationships in incestuous families, as described by mental health experts, and the characteristics of the individuals and relationships of the family in question." *In Matter of Nicole V.*, 71 N.Y.2d 112, 524 N.Y.S.2d 19, 518 N.E.2d 914, 917 (1987); *accord Taylor*, 552 N.Y.S.2d 883, 552 N.E.2d at 135.

Evidence of such rape trauma syndrome, however, is not admissible "when it inescapably bears solely on proving that rape occurred," as opposed to explaining behavior that may appear unusual to the average juror. *Taylor*, 552 N.Y.S.2d 883, 552 N.E.2d at 139.

Henry did not testify to whether Nnedi and Chendo exhibited behavior indicative of sexual abuse, but rather related victims' behavioral characteristics not generally known by the average juror. So far, Henry's testimony was entirely admissible under New York law and, therefore, counsel did not err in failing to object to the testimony. Yet, the defense may have had a valid objection that Henry's statement that only one child out of nearly fifty-to-one hundred lied implied that Chendo and Nnedi were telling the truth. *See Snowden v. Singletary*, 135 F.3d 732, 737–39 (11th Cir.) (granting a habeas petition in part because expert testified that 99.5% of children tell the truth regarding sexual abuse allegations), *cert. denied*, 525 U.S. 963, 119 S.Ct. 405, 142 L.Ed.2d 329 (1998). It also is possible, however, that there was a strategic explanation for not objecting. The defense may have decided not to draw attention to this matter during direct examination, but instead attack the testimony on cross examination, where Henry acknowledged that there had been no judicial determination of the truth of the allegations in those cases.

Eze's second argument regarding Henry's testimony is a different matter. Eze contends, as he did regarding Dr. Lazoritz's expert testimony, that his counsel erred by ineffectively cross-examining Henry's expert testimony and by failing to call an expert to challenge her testimony. Despite the fact that it was largely limited to an unbiased explanation of child sexual abuse syndrome, and although counsel was able to elicit favorable admissions in cross

examination, Henry's testimony was extremely damaging to Eze's defense. Henry testified that child sexual abuse syndrome can explain why an abused child makes inconsistent statements or withholds information regarding the occurrence or extent of the abuse. In response to a question about why a child might seem to allow abuse to take place or continue without protest, Henry stated children often have a sense of "hopelessness" and feel "powerless" to stop the abuse. Henry also remarked that inconsistencies in a child's allegations and statements are to be expected, and that "the issue of consistency is very important to evaluate because you don't want a child's statement to be too consistent because, in fact, if it's too consistent, it can have the quality of being memorized or rote or programmed."

The reasoning of *Lindstadt* and *Pavel* applies with equal force here as well. Henry's testimony was arguably devastating to Eze's defense because it explained why the girls may have withheld disclosure for so long and why their testimony was inconsistent at trial. Eze's counsel thus had a heightened responsibility to educate herself on the topic of child sexual abuse syndrome and, if necessary, consult an expert in preparation for trial to ensure her client's interests were properly represented.

We begin with the defense's cross examination of Henry's expert testimony. Defense counsel questioned Henry on other studies critical of the behavioral patterns she discussed and suggested other factors that could have accounted for the girls' behavior beside sexual abuse. In light of the significant deference we accord a trial counsel's decision how to conduct cross examination and our refusal to use perfect hindsight to criticize unsuccessful trial strategies, we decline to find deficient the cross examination of Henry. *See Dunham*

*v. Travis*, 313 F.3d 724, 732 (2d Cir.2002) ("Decisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature' and generally will not support an ineffective assistance claim.") (quoting *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.1987)); *United States v. Eisen*, 974 F.2d 246, 265 (2d Cir.1992) (same), *cert. denied*, 507 U.S. 1029, 113 S.Ct. 1840, 123 L.Ed.2d 467 (1993).

Even granting our conclusion about the cross examination of Henry, we nonetheless are troubled by the defense's failure to call an expert witness to refute Henry's testimony. By not offering a rebuttal expert, the jury was almost certain to give significant weight to Henry's explanation of the behavior of sexually abused children. A defense expert in this field could have undercut the testimony, as well as arguments made in the prosecution's summation which drew heavily from Henry's testimony. As we discussed earlier, *see supra* II.B.1.b., counsel's decision not to call a particular witness usually constitutes trial strategy that we hesitate to second-guess so long as the strategy advanced the client's interests. *Pavel*, 261 F.3d at 218–19; *Luciano*, 158 F.3d at 660. From the record before us, however, we cannot tell if the defense's failure to call an expert to refute Henry's testimony reflected a sound trial strategy or perhaps some unjustifiable reason, such as a desire to avoid work. *See Pavel*, 261 F.3d at 218.

**c. Chendo and Nnedi's Inconsistent Statements**

Eze also argues that his counsel failed to sufficiently emphasize Chendo and Nnedi's changing story about the abuse and who participated in it. We agree that any inconsistencies in the girls' stories were absolutely critical to the defense. The case against the defendants was built predomi-

nantly on the girls' testimony. Therefore, it is hard to imagine anything more important for the defense than calling into question the veracity of the children's testimony about the abuse. Indeed, Eze's counsel emphasized in her opening statement that the girls' inconsistent stories would be a focus of Eze's defense: "[Y]ou're going to hear inconsistencies, you're going to hear that my client was not mentioned until after, long after the incident."

Defense counsel faced the unenviable task of cross-examining two young girls who, according to the prosecution, were victims of heinous and brutal sexual abuse. Therefore, defense counsel needed to draw out inconsistencies in the girls' stories, yet take caution not to cross the line by questioning these sympathetic witnesses too severely in the presence of the jury. Eze's counsel highlighted several inconsistencies in the children's story, such as whether Okongwu was with Eze when Eze picked up the girls in June 1991, whether Okongwu would have intercourse with them on the mattress or on the floor, and whether Eze and Wosu came downstairs during the June 1991 incident. In addition, Eze's counsel elicited testimony from Chendo that she went over her testimony with McNair in preparation for trial.

Yet, while we understand the reluctance to appear aggressive toward the victims, one key inconsistency that would have severely undercut the children's credibility was inexplicably ignored by defense counsel. Henry's notes from her January 1992 interviews with the girls reported that Chendo and Nnedi both stated they wanted to see "Uncle Lewis [sic]" because "they wanted to ask him if he knew about 'what our father did to us.'" This evidence seems of enormous value for Eze's defense because it significantly undermines the girls' trial testimony that Eze sexually abused them in November 1991.

The statement reported in Henry's notes is much more valuable than the girls' initial silence regarding Eze's participation, which the jury could have disregarded after hearing Henry's testimony that sexually abused children experience suppression and gradual disclosure stages. Yet, for whatever reason, no effort was made by defense counsel to present this evidence. " '[A]n attorney's failure to present available exculpatory evidence is ordinarily deficient, unless some cogent tactical or other consideration justified it.' " *Pavel,* 261 F.3d at 220 (quoting *Griffin v. Warden,* 970 F.2d 1355, 1358 (4th Cir.1992)). In addition, it seems that the defense could have offered this evidence without the undesirable effect of aggressively questioning the girls on cross examination.

Eze also criticizes his counsel's attempts to impeach Chendo with her statements to the grand jury and to the police, claiming that his counsel "failed miserably because of her lack of familiarity with basic foundational rules for impeaching witnesses." Eze therefore argues that the jury may have inferred the nonexistence of prior inconsistent statements which did exist, as well as the existence of consistent statements which did not exist. While the impeachment of Chendo did not go smoothly, the problems did not appear to arise from defense counsel's ineptitude, but rather from the difficulties inherent to impeaching a nine-year-old child. Nonetheless, Eze's counsel was able to bring forth several inconsistencies between Chendo's trial testimony and both her grand jury testimony and statements to the police. We thus do not find deficient the defense's impeachment of Chendo.

#### d. The Objection to Eze's Supervision

Peter Nichols, an attorney for the Erie County Department of Social Services, testified for the prosecution about the court

order appointing Eze to supervise Okong-wu's visitation of Chendo and Nnedi. In the course of his brief testimony, Nichols mentioned, without elaboration, that "[t]here had been an objection to Mr. Eze." Defense counsel neither objected to this testimony nor cross-examined Nichols as to the nature of the objection. In actuality, the objection was unrelated to Eze's character or credibility. Nichols testified before the grand jury that he objected, on behalf of the Department of Social Services, to Eze's appointment solely on the basis of Eze's gender, preferring instead that a woman supervise the girls. The jury, however, never learned that gender was the reason for the objection to Eze's supervision.

It appears that counsel should have raised an objection to this testimony or clarified matters through cross examination. Nichols testimony was damaging to Eze because it called his credibility and character into question. Considering that Eze was on trial for sexual abuse, a mention that there was an objection to his supervision, without any further explanation, could very well have set off alarms in the minds of the jurors questioning his credibility and character. The jury could have inferred that the objection to his supervision was material and, coupled with the prosecution's other attempts to impeach Eze's character and credibility, the testimony may have led the jury to suspect that Eze was a person not to be trusted. At the same time, however, the mention of the Department of Social Service's objection was extremely brief and was not stressed at all by the prosecution at any point of the trial. Therefore, defense counsel may very well have decided that it was better to leave that issue untouched rather than bring attention to it.

### e. Eze's False Statements in his Citizenship Application

Eze argues that his counsel failed to act with reasonable competence by neglecting to object to the prosecution's questioning regarding his withdrawn citizenship application. In 1990, Eze filed an application for United States citizenship in which he claimed to be residing with his wife for a three-year period. Eze, however, subsequently withdrew his citizenship application after his estranged wife filed an affidavit stating, in effect, that he had lied on the application about whether they were living together. According to Eze's wife, Eze moved out in December 1987 and they had not lived together since.

The prosecution cross-examined Eze extensively on his withdrawn citizenship application in an attempt to impeach his credibility and trustworthiness.[10] In the course of the questioning, Eze testified that he had moved out for a while after he and his wife had an argument, but he subsequently returned and they continued to live together. The prosecutor then had Eze identify his wife's affidavit and asked, "isn't it true that your wife told the Immigration and Naturalization Service that the day you moved out in December of 1987, you never lived together again after that?" After Eze claimed that his wife's statements in the affidavit were untrue, the

---

10. Before trial, the prosecution stated its intent to introduce evidence that Eze lied on his citizenship application, contending that the evidence went directly to Eze's credibility. Eze's counsel responded that Eze informed her that while he and his wife were living at separate residences, they remained in contact with each other, maintained a relationship, and for the most part were husband and wife. She then requested that the prosecutor provide her with all the relevant information before she proceeded further on the issue. The trial judge then ruled, shortly before the trial began, that the prosecution would be allowed to inquire into Eze's immigration record if he took the stand.

prosecutor asked whether he withdrew his application because he knew charges were going to be filed against him for filing false statements with the INS. Defense counsel did not object to any of these questions. The prosecutor, without objection, also discussed Eze's prior bad act of filing a false INS application during his summation.

It appears to us that Eze's counsel should have objected to the prosecution's use of his wife's affidavit to impeach his credibility. Pursuant to New York evidentiary rules, "the party who is cross-examining a witness cannot introduce extrinsic documentary evidence ... solely for the purpose of impeaching that witness's credibility." *People v. Pavao*, 59 N.Y.2d 282, 464 N.Y.S.2d 458, 451 N.E.2d 216, 219 (1983); *see People v. Alvino*, 71 N.Y.2d 233, 525 N.Y.S.2d 7, 519 N.E.2d 808, 816 (1987) ("The general rule is that a party may not introduce extrinsic evidence on a collateral matter solely to impeach credibility."). When impeaching a witness on collateral matters, the cross-examining attorney "is bound by the answers of the witness to questions concerning collateral matters inquired into solely to affect credibility." *Pavao*, 464 N.Y.S.2d 458, 451 N.E.2d at 219 (citation and quotation marks omitted). It therefore seems improper for the prosecutor to have impeached Eze with his wife's affidavit after he stated that he had moved out for awhile, but returned. *See Superior Sales & Salvage, Inc. v. Time Release Sciences, Inc.*, 227 A.D.2d 987, 643 N.Y.S.2d 291, 291 (4th Dep't 1996) (holding that the trial court properly precluded the party from using another person's affidavit to impeach the witness's credibility and noting "the

affidavit was extrinsic evidence of a collateral matter"). Further, the evidence contained in the affidavit was not material to this case, and only served the purpose of impeaching Eze's credibility. *See People v. Mink*, 267 A.D.2d 501, 699 N.Y.S.2d 742, 744 (3d Dep't 1999) (holding that the "general rule is not applied where the issue to which the evidence relates is not a material one, that is, one that the jury must decide").

The District Court concluded that, although the form of the prosecutor's questions was improper, it was unclear that an objection would or could have prevented the prosecutor from engaging in the line of questioning.[11] We disagree. The impeachment came entirely from Eze's wife's affidavit; it therefore is unclear to us how the prosecution could have impeached Eze without using extrinsic evidence. On the other hand, it very well may have been the case, as the District Court noted,[12] that the defense's failure to object was grounded in strategic considerations. *See Seehan v. Iowa*, 72 F.3d 607, 611 (8th Cir.1995) (finding that defense counsel's decision not to object was grounded in trial strategy and thus did not constitute deficient performance under *Strickland* ), *cert. denied*, 517 U.S. 1173, 116 S.Ct. 1578, 134 L.Ed.2d 676 (1996). From the record before us, however, we cannot conclude with any certainty that this decision was grounded in trial strategy and, if so, what that strategy was.

**f. Cumulative Effect of Counsel's Acts and Omissions**

We now assess the aggregate effect of these alleged errors to determine whether

---

**11.** Although the District Court did not address whether the failure to object constituted deficient representation, it held that such failure was not prejudicial.

**12.** The District Court reasoned that counsel may have made a strategic decision not to draw the jury's attention through objections to a subject that would ultimately come out through the prosecution's questioning anyway.

their cumulative weight rises to the level of constitutionally deficient conduct. *See Pavel,* 261 F.3d at 216; *Lindstadt,* 239 F.3d at 202. This was not a case where defense counsel failed at all points to provide adequate representation. *Cf. Pavel,* 261 F.3d at 216–17 (finding ineffective assistance because, in part, defense counsel "opted not to prepare a defense"); *Lindstadt,* 239 F.3d at 201 (granting writ where "[d]efense counsel made no challenge" to the prosecution's only physical evidence). We note, for example, that the defendants' attorneys elicited key acknowledgments from the prosecution witnesses and offered some testimony refuting the girls' stories. Yet, as discussed above, defense counsel's performance at numerous key points of trial raises serious constitutional concerns.

While it is fundamental that acts and omissions that could be considered sound trial strategy do not rise to the level of deficient performance under *Strickland,* we cannot presently conclude that Eze's counsel's actions were grounded in trial strategy. This does not mean, however, that no trial strategy could have justified counsel's actions. Rather, it is that with the record before us, we are unable to assess with confidence whether strategic considerations accounted for Eze's counsel's decisions. As we know from previous cases, sometimes no adequate justification exists. In *Pavel,* for instance, counsel's strategy boiled down to a desire to avoid extra work. 261 F.3d at 217–18. Conversely, there may have been legitimate strategic considerations that came into play that are not transparent on a cold record. If, for instance, Eze's counsel had thoroughly investigated Dr. Lazoritz's medical conclusions and interviewed potential expert witnesses, the decision not to call an expert would not necessarily constitute constitutionally deficient performance. *See id.* at 225 (quoting *Holsomback v.*

*White,* 133 F.3d 1382, 1388 (11th Cir. 1998)).

■■■ "[A] district court facing the question of constitutional ineffectiveness of counsel should, except in the highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs." *Sparman v. Edwards,* 154 F.3d 51, 52 (2d Cir.1998) (per curiam). Therefore, "the usual practice [is] to remand *Strickland* cases to the district court to permit the attorney in question to testify and explain her actions." *Jackson v. Leonardo,* 162 F.3d 81, 86 (2d Cir.1998). Only in the "highly unusual case where no plausible explanation for an attorney's actions exists" do we grant the writ without an evidentiary hearing because, in such a case, a remand would be a waste of judicial time. *Id.* This is not one of those rare cases.

We therefore remand to the District Court to afford Eze's trial counsel the opportunity to explain the following acts and omissions:

1) Why counsel did not introduce evidence of Nnedi's 1988 medical examination, which revealed similar findings to Dr. Lazoritz's 1992 examination of Nnedi;

2) Why counsel did not call a medical expert to refute Dr. Lazoritz's conclusions regarding, *inter alia,* the significance of hymen attenuation and the significance of the lack of other injuries to the girls;

3) Why counsel did not call an expert to refute Henry's testimony regarding the behavioral patterns of sexually abused children;

4) Why counsel did not impeach Henry on the basis that her testimony concerning the *greater* probative value of inconsistent child testimony was self-serving—that is, that such testimony was

proffered here to justify the inconsistencies in the testimony that she herself elicited from the children;

5) Why counsel did not offer evidence of the girls' prior statements to Henry, in particular their question about whether Eze knew what their father was doing to them;

6) Why counsel did not object to Nichols's mention of the objection to Eze's supervision or elicit testimony explaining the nature of that objection;

7) Why counsel did not object to the prosecution's use of Eze's wife's affidavit to impeach his credibility regarding his withdrawn citizenship application; and

8) Why counsel did not argue in her closing argument or through examining the witnesses that the prosecution failed to offer any scientific or forensic evidence that linked Eze to the alleged sexual abuse.

It does not appear that offering any of this evidence or advancing any of these arguments would have interfered with the defense's ability to make other arguments. *See Jackson,* 162 F.3d at 85 (finding ineffective assistance where appellate counsel failed to make a "sure winner" argument that would not have interfered with making other arguments). Notwithstanding the rigors of the *Strickland* standard, counsel's inability to justify her actions by some plausible trial strategy could very well lead to the conclusion that her performance was constitutionally deficient under *Strickland* 's first prong. *See Jackson,* 162 F.3d at 85 ("[R]elief may be warranted when a decision by counsel cannot be justified as a result of some kind of plausible trial strategy.") (citing *Kimmelman v. Morrison,* 477 U.S. 365, 385, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)); *see also Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994) ("[A] petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.").

### 2. "Reasonable Likelihood"

We also note that, if it is determined following an evidentiary hearing that counsel's trial performance was constitutionally deficient, it is highly likely that *Strickland* 's prejudice component would be satisfied. Under AEDPA, a federal habeas court must consider whether the Appellate Division's decision was "an objectively unreasonable application of the teachings of the Supreme Court in *Strickland* " regarding the prejudice prong. *Aeid v. Bennett,* 296 F.3d 58, 64 (2d Cir.2002). *Strickland* 's prejudice inquiry looks at whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. This requires the defendant to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A reasonable probability, under *Strickland,* "is one sufficient to undermine confidence in the outcome of the trial." *Aparicio v. Artuz,* 269 F.3d 78, 95 (2d Cir.2001).

Eze's conviction rested entirely on Chendo and Nnedi's stories, Henry's explanation of why sexually abused children tell inconsistent and changing stories, and Dr. Lazoritz's medical conclusions that sexual activity may have occurred. In each of these critical areas, Eze received representation of a quality that concerns us. It seems beyond dispute that the jury's decision to credit the girls' testimony went to the very heart of this case. Yet, the jury never learned that, in January 1992, the girls asked Henry whether Eze knew what their father had done to them. Similarly, to the extent that the

girls told inconsistent and changing stories, the prosecution attempted to substantiate the girls' credibility through Henry's testimony on the behavioral stages of sexually abused children. Because the defense did not call a rebuttal expert, the jury may have accepted the girls' inconsistent stories in light of Henry's testimony. Were the credibility of the girls' stories identifying Eze as an assailant undermined, the link to Eze would have become all the more attenuated. In addition, without Dr. Lazoritz's medical conclusions, we doubt that the jury would have concluded that sexual assault occurred in 1991. The defense, however, inexplicably failed to show that Nnedi's 1988 medical examination reflected findings similar to those from 1992, which would have cast significant doubt as to whether Nnedi's physical condition existed prior to the alleged abuse in 1991. Further, although part of the methodology for Dr. Lazoritz's conclusions had been criticized by experts in the medical community, the defense failed to bring forward these questions either through an effective cross examination or through its own expert witness. Accordingly, Eze's counsel's inability to provide a convincing explanation for these critically important omissions would undermine our "confidence in the outcome of the trial." *See Aparicio,* 269 F.3d at 95.

## CONCLUSION

For the reasons stated above, we VACATE the judgment of the District Court denying Eze's petition for a writ of habeas corpus and REMAND with instructions to conduct an evidentiary hearing on Eze's counsel's trial performance, and thereafter to enter a judgment consistent with its findings and with this opinion.

On remand, the District Court shall have completed its evidentiary hearings on the issues enumerated above regarding the effectiveness of Eze's counsel by the sixtieth calendar day after the issuance of our mandate. We further direct the District Court to reconsider Eze's petition for a writ of habeas corpus expeditiously upon the conclusion of the evidentiary hearings. The mandate shall issue forthwith.

If further proceedings arising from Eze's habeas petition are required in this Court, the parties shall inform the Clerk of this Court. Jurisdiction will then be automatically restored to this Court without need for a new notice of appeal. *See United States v. Jacobson,* 15 F.3d 19, 21–22 (2d Cir.1994). After jurisdiction is restored, the Clerk shall set an expedited briefing schedule, and the matter will then be heard by this panel on letter briefs.