Charles SINGLETARY, Petitioner,

v.

Brian FISCHER, Respondent.

No. 01–CV–08016.
No. 03–MISC–0066.

United States District Court,
E.D. New York.

Sept. 10, 2003.

Corrected April 11, 2005.

212

Barry G. Rhodes, Attorney at Law, Brooklyn, NY, for Petitioner.

Linda Susan Breen, Kings County District Attorney's Office, Brooklyn, NY, for Respondent.

**CORRECTED** MEMORANDUM
and ORDER

WEINSTEIN, Senior District Judge.

The petition for a writ of habeas corpus is stayed to permit petitioner to exhaust, if possible, any state claim for inadequate counsel or involuntariness of his admissions. [The writ was ultimately granted. *See Singletary v. Fischer,* 365 F.Supp.2d 328 (E.D.N.Y. 2005).] No hearing on this matter is necessary at this time. This memorandum briefly addresses petitioner's claims.

### I. *Facts and Procedural History*

This petition was filed on November 11, 2001. Petitioner (sometimes referred to as defendant or appellant) makes the following claims:

Petitioner is in state custody in violation of the United States Constitution, because:

1) Where the only link between petitioner and the crime was a repudiated confession, petitioner was denied a fair trial by the prosecutor's arguing to the jury from misstatements of fact, offering a conjectural and inflammatory reconstruction of the crime, mischaracterizing the defense, and encouraging the jurors to base their verdict on sympathy for the deceased;

2) The reliability of petitioner's statements is highly suspect, where the police, after a perfunctory initial investigation which they had allowed to cool for two years, deployed all the tactics of accusatory interrogation against petitioner whom they knew to be illiterate and without an arrest record. The subsequent combination of deception and implied promises amounted to coercion rendering the resulting statements both involuntary and untrustworthy, in violation of petitioner's federal constitutional rights; and

3) The jury had only two sources of information from which to infer the objective circumstances surrounding the homicide, neither of which evinced depravity: petitioner statements and the Medical Examiner's testimony. Petitioner stated "it wasn't no real big argument," but he got "a little upset" and put his hands around his niece's throat to scare her into admitting that she had money. "It was an accident, I didn't mean to kill her." Such conduct cannot be said to attain the standard of unmotivated wickedness so great as to be indicative of depravity.

And, as argued in Point I of petitioner's appellate brief, the jury could not properly conclude that the pressure petitioner placed on his niece's throat was prolonged in view of the Medical Examiner's testimony that the duration of the pressure could not be determined beyond a range from seconds to minutes. Therefore, the element of depraved indifference to human life was not proved. (The facts and law supporting petitioner's claims are set forth in detail in petitioner's appellate brief.)

He was convicted after a trial. In his brief for the Appellate Division, the following facts were described:

On May 27, 1995, a young woman was found manually strangled in her apartment. There was no sign of forcible entry or robbery. Although the police initially identified three possible suspects, the case remained open for over two years. In July, 1997, the police contacted appellant, an uncle of the deceased, whose existence they had overlooked, although he was living across the hallway from the deceased at the time of the incident.

Appellant was 42 years old, with no criminal record, illiterate, with a learning disability. He was dependent on welfare and his family for financial support. When appellant appeared at the precinct in response to the detective's request, the latter, arguably falsely, represented that there was evidence against him, that his family believed he was guilty, and accused him of killing his niece. The detective also promised that his family would "support his rehabilitation." After denying the accusation, appellant signed a brief statement written by the detective saying that he had gone to his niece's apartment to borrow money to buy drugs. When she refused, he put his hands around her neck to scare her, but that he hadn't meant to kill her, it was an accident. Four hours later, appellant made a short videotaped statement,

again asserting that it was an accident and that he had never meant to kill his niece. The videotaped version added that he had taken $25 from on top of her television set. The jury returned a verdict of guilty of depraved indifference murder.

At sentencing, appellant addressed the court, saying he had nothing to do with the murder, that he said what he was told to say because he was scared and the detective had promised that if he confessed to having killed his niece by accident, he would only be sentenced to a drug program. The court, "disappointed" that appellant protested his innocence, sentenced him to a prison term of 20 years to life.

*Evidence of Homicide*

On the morning of May 27, 1995, Mrs. Anne June went to visit her 25–year–old daughter, Cassandra, at 749 Pennsylvania Avenue, Brooklyn, and discovered her lying dead on the floor just inside the front door of her apartment (Trial Tr. ("Tr.") at 29, 31, 34). Mrs. June's brothers, George Singletary and appellant, lived across the hallway from the deceased in the same apartment building (*Id.* at 29, 33). Mrs. June was close to appellant and had continued to see him during the time between her daughter's death and his arrest two years later (*Id.* at 35, 36).

The Medical Examiner determined the cause of death to be manual strangulation, causing multiple abrasions to the neck, with a force hard enough to cause pinpoint hemorrhages in the eyes and neck muscle (*Id.* at 50–51). She could not say whether one or two hands had been used, nor could it be determined how long the pressure had been exerted (*Id.* at 51–52). The closest estimate the Medical Examiner could make was that the pressure had lasted anywhere from a few seconds to one or two minutes (*Id.* at 52, 55).

Samples of hair, fingernails and swabs were taken from the body (*Id.* at 55–56). The detective in charge of the case admitted that, contrary to proper procedure, the clothes the deceased had been wearing when she was killed were left in the apartment and not been taken to the morgue, although "eventually they got there" (*Id.* at 112).

The police found no sign of a break-in and no apparent ransacking of the apartment, although a ring, an earring, a chain, and a button were found on the floor near the body (*Id.* at 64–65; *id.* at 158–64). The Crime Scene Unit searched for fingerprints, but did no other testing of the scene (*Id.* at 152, 154–55, 163–64). They recovered only one fingerprint "of value," i.e., clear enough to be compared, which turned out to belong to one of the police officers at the scene (*Id.* at 174–75). The only two palm prints of value failed to match any known person, including appellant (*Id.* at 174–76). There was no physical evidence from the body, the clothes, or the apartment linking appellant to the crime (*Id.* at 113).

According to Detective Maher, the police "interviewed a lot of people" at the crime scene, including the parents and neighbors of the deceased, as well as "a couple of uncles" (*Id.* at 70–71). Although appellant, the deceased's uncle, was living across the hallway from her at the time, the police failed to learn of his existence in the course of their interviews (*Id.* at 33; *id.* at 75).

Maher nevertheless identified three possible suspects: an ex-boyfriend of the deceased; a male co-worker who had been out with her that evening; and an upstairs neighbor. Maher claimed at first that his investigation had determined that all of the suspects were "alibied up" (*Id.* at 96–98). Although the upstairs neighbor, who had an extensive criminal record including a 3–year prison sentence for attempted rape and whose apartment was full of weight lifting equipment, fit the profile of the murderer as someone physically strong, Maher testified that he had determined that the man was "working at the time" in question (*Id.* at 73, 103). After intensive cross-examination, Maher conceded that the neighbor had no alibi at all, and that he had merely claimed to have been home alone in his apartment all evening drinking beer and smoking pot (*Id.* at 73, 99–101). Maher did not subject him to the same kind of interrogation to which he subjected appellant, although appellant, at five feet nine and weighing only 130 pounds, arguably did not fit the profile (*Id.* at 102–04).

Maher also interviewed the deceased's co-worker who had been out with her "hours before she arrived home" (*Id.* at 72, 96). Maher admitted that he did not know when the deceased had arrived home and that his estimate of the time of death was based on the coworker's uncorroborated word about what time he had last seen her (*Id.* at 96, 114).

Maher also questioned the deceased's ex-boyfriend who told him that she had complained about being followed by a stranger (*Id.* at 73, 110–11). There was apparently no further investigation of this (*Id.* at 111).

### Interrogation of Appellant

Nine months after the incident, Maher interviewed the brother of the deceased, Levi June, Jr., and heard of appellant for the first time (*Id.* at 75). Since Maher was working on other homicides, it was another year and a half before he went to the home of appellant's aunt in Brooklyn where appellant was living, and left his business card (*Id.* at 77). Appellant telephoned Maher that evening and they made an appointment at the precinct for July 14, 1997 (*Id.* at 77–78). After giving his fingerprints and palm prints, appellant agreed to speak to Maher in a room and was orally given *Miranda* warnings (*Id.* at 79–80, 84).

Appellant challenged the admissibility of the statements at a *Huntley* hearing, arguing that the People had failed to prove that he had received his complete *Miranda* warnings and that the statement had been elicited by coercive techniques. The court denied suppression. (Hearing of June 1, 1998).

When Maher asked if he had seen Cassandra on the night she was killed, appellant replied that he had not (Tr. at 81). Maher responded, "I don't believe you," and commenced an accusatory interrogation:

> I told him I believe he killed Cassandra. I told him I believe his family believes he killed Cassandra. I believe he had a problem and I believe, you know, that they were forgiving people, they're church-going people, that they would forgive him eventually, but they had a problem and

they didn't deserve to have this open, that they needed some closure.

(*Id.* at 81–82).

Maher admitted that he had "bluffed" appellant by telling him that his family thought he was guilty and would support his "rehabilitation" (*Id.* at 105). Maher claimed that by "rehabilitation" he meant that "if [appellant] had a drug problem I'm sure the family would support him" (*Id.* at 104). He denied that he had "scared" appellant into saying something that wasn't true (*Id.* at 105).

Maher wrote out a statement for appellant, who could not read or write (*Id.* at 87–88, 106). The statement in its entirety read,

> I went to Cassandra's house to borrow money. I knocked on the door. She let me in. We're standing there talking by the bedroom door. She said, 'I don't have no money.['] She turned and went to walk away. I grabbed her, I swung her around. I put my hands around her throat. She fell to her knees. She fell to the floor. It was an accident. I didn't mean [to] kill her. I didn't want to kill her. I left. I went for a walk to calm my nerves and get myself together. I came back to the house. George was there. I changed clothes and said I was going out for the night. I came back the next day. I didn't tell anyone.

(*Id.* at 87).

Maher estimated that appellant arrived at the precinct at about 4 p.m., and that he gave the written statement at 5:15 p.m. (*Id.* at 79, 91). He claimed that appellant spent the next four hours alone in the "interview" room with the door closed, although he himself was "in and out" (*Id.* at 91). He could not remember if appellant asked for food or for the bathroom (*Id.*).

The videotape, which was played for the jury (*id.* at 93), shows appellant in a state of distress, crying and shaking (Videotape, People's Exhibit # 4) (not transcribed). He is interviewed by an assistant district attorney with Maher sitting facing him across the room. In answer to the assistant's questions, appellant recounted that in May, 1995, he was living with his brother, George, across the hallway from his niece, Cassandra. He

had borrowed money from Cassandra once or twice before, but "when she gave me money, it wasn't like she was lending it to me, she was giving it to me." Cassandra "was always there when I needed her." She had never really refused him money, and never got mad if he asked her for it, or at least, "if she did, she didn't let me know about it." Appellant had just started to receive welfare checks, which he entrusted to Cassandra and her mother to manage for him.

On the night of May 26, 1995, appellant was out on the street smoking pot with his friends and wanted to buy more. He went to his niece's apartment and knocked on the door. She invited him in and they talked for five or ten minutes. He asked if she had any money, and she said no. He guessed, "she just tell me she didn't have no money 'cause she wanted to use her own money for what she wanted to use it for.'" He asked her again, and she started to walk away. There was no "big argument," but appellant "got a little upset." He grabbed her by the neck to scare her, but hadn't meant to kill her. In contrast to the written statement, which makes no mention of taking anything from the apartment, appellant adds on the video-taped statement that he took $20–25 from on top of the television set in the bedroom. He returned to George's apartment and told him he would be out all night. When he returned home the next morning, he "saw everybody standing around and they said she was dead." Appellant repeatedly affirmed that he hadn't meant to kill his niece. He was asked if his niece had been wearing a chain around her neck, to which he answered, "I don't remember." He was not asked why there was jewelry on the floor near the body.

*Motion to Dismiss and Charge*

At the close of the People's case, defense counsel moved to dismiss the counts of felony murder and depraved indifference murder (Tr. at 179). The court, unopposed by the People, dismissed the felony murder count for legal insufficiency (*Id.* at 182–83). Regarding the second count, the court said, "If there's something I'm missing with respect to the depraved murder count, by all means, call it to my attention. Because as far as I can see, it has been established" (*Id.* at 179).

Defense counsel replied that he was relying on the record, and the motion was denied (*Id.* at 180). The court agreed to charge second-degree manslaughter as a lesser included count, as defense counsel had requested earlier (*Id.* at 121, 183).

*Prosecutor's Summation*

The prosecutor told the jury that, regardless of the Medical Examiner's inability to say whether the pressure lasted for seconds or minutes, they should "[u]se your own common sense. You don't have to be a doctor to know this," and, "You know it wasn't for five seconds. She'd be here if it were five seconds" (*Id.* at 202). As evidence of depravity, the prosecutor offered the jury in lengthy dramatic visualization of the incident:

> [H]e asked her again for money and she says, "No" again and she turns around, and here is where the incredible depravity of his act comes in. . . .

(*Id.* at 201).

> [I]t was long enough that he was able to, face-to-face, look into her eyes as she struggled for her life dropping to the ground on her knees in front of him still with his hands around her neck, still squeezing the life out of her. She wasn't dead yet. He didn't stop then.

(*Id.* at 202).

> You're talking about his eyes, that close to hers, seeing this distress that she was in, understanding that she was not able to[ ] breathe and continuing to do it. Continuing to squeeze the life out of her. That inanimate mass is there. The feeling. You are touching that person. Your hands are on them. You're not standing 10 feet away with a gun or a knife. You're feeling with your own hands the life ebb away from her. Your own hands are feeling it as she's losing the ability to breathe. And when she dropped to her knees he didn't stop. He didn't stop until that's where she was, on her back, dead.

(*Id.* at 203–04).

The prosecutor repeatedly characterized appellant as blaming the killing on drugs, although nothing to this effect appears in either statement, saying, "Charles Singletary would have you believe in his videotaped

statement that what he did was a result of external forces, those evil drugs forcing him to do this" (*id.* at 204–05), and that "He says, 'The drugs made me do it'" (*id.* at 206). Counsel objected and the jury was instructed to disregard those statements (*Id.*). The prosecutor returned to the theme, characterizing appellant's argument as,

> I didn't mean to do it because the drugs were the problem, those evil external force drugs, I didn't confess voluntarily. Those evil detectives forced me to.

(*Id.* at 211–12).

After arguing at length that appellant's emotion on the video merely showed what a selfish person he was, the prosecutor then told the jury that appellant had been "two and a half years on the lam." (*Id.* at 209–10). Defense counsel objected that there was no evidence to this effect, the court ordered the statement stricken, and the prosecutor withdrew it (*Id.* at 210).

The prosecutor asserted that appellant, by going to trial, was "begging" the jury for the "mercy" that he had not shown to his niece (*Id.* at 212–13). Counsel's objection was sustained (*Id.* at 213). The prosecutor concluded by telling the jury that appellant

> through the *incredibly depraved act* that he confessed to there on that video, he decided on that day that the life of his beloved niece, Cassandra June, at the age of 25 years old was worth nothing. Absolutely nothing. It's up to you to decide otherwise.

(*Id.* at 214 (emphasis added)).

Counsel objected that the jury's job was not to decide whether the deceased's life was worth something (*Id.*). The objection was sustained (*Id.*).

Defendant was sentenced to an indeterminate term of twenty years to life. On May 21, 2001, petitioner's judgment of conviction was unanimously affirmed by the Appellate Division. *People v. Singletary*, 283 A.D.2d 594, 724 N.Y.S.2d 897 (App. Div.2d Dep't 2001).

In his direct appeal, petitioner claimed that: 1) the prosecutor's summation was improper; 2) the People did not prove that petitioner's statement was voluntary; and 3)

the People failed to prove the element of depraved indifference to human life.

The Appellate Division held: 1) petitioner did not preserve for appellate review his claim that the summation was improper, that the summation was almost entirely a fair response to the defense summation, and that any error was harmless in light of the overwhelming evidence of petitioner's guilt; and 2) that petitioner also failed to preserve for appellate review his claim that the People did not prove his guilt by legally sufficient evidence, and that in any event, the People did so prove.

The Appellate Division noted:

> The defendant's general motion for a trial order of dismissal did not preserve for appellate review his present challenge to the legal sufficiency of the evidence (*see,* CPL 470.05[2]; *People v. Brown,* 270 A.D.2d 496, 705 N.Y.S.2d 300; *People v. Banks,* 258 A.D.2d 525, 526, 685 N.Y.S.2d 262). In any event, viewing the evidence in the light most favorable to the prosecution (*see, People v. Contes,* 60 N.Y.2d 620, 467 N.Y.S.2d 349, 454 N.E.2d 932), we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. Moreover upon the exercise of our factual review power, we are satisfied that the verdict of guilt was not against the weight of the evidence (*see,* CPL 470.15[5]).

> The defendant also failed to preserve for appellate review his contention that certain comments in the prosecutor's summation constituted reversible error (*see, People v. Gray,* 86 N.Y.2d 10, 19, 629 N.Y.S.2d 173, 652 N.E.2d 919; *People v. Heide,* 84 N.Y.2d 943, 944, 620 N.Y.S.2d 814, 644 N.E.2d 1370; *People v. Rosario,* 195 A.D.2d 577, 601 N.Y.S.2d 836). In any event, many if not all of the challenged comments were a fair response to defense counsel's summation.

283 A.D.2d at 595, 724 N.Y.S.2d 897. The Appellate Division was silent on its reasons for also rejecting the claim that the statement was involuntary.

On August 3, 2001, leave to appeal to the New York Court of Appeals was denied.

*People v. Singletary,* 96 N.Y.2d 924, 732 N.Y.S.2d 642, 758 N.E.2d 668 (2001).

## II. *AEDPA*

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

▮ An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman,* 261 F.3d 303, 313 (2d Cir.2001) (quoting *Aycox v. Lytle,* 196 F.3d 1174, 1178 (10th Cir.1999)). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be lim-ited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted).

▮ "[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton,* 295 F.3d 270, 278 (2d Cir.2002); *see also Yung v. Walker,* 341 F.3d 104 (2d Cir. 2003) (remanding for reconsideration district court's habeas decision that relied on precedent from the court of appeals in light of "the more general teachings" of Supreme Court decisions). The Court of Appeals for the Second Circuit has also indicated that habeas relief may be granted if a state court's decision was contrary to or an unreasonable application of "a reasonable extension" of Supreme Court jurisprudence. *Torres v. Berbary,* 340 F.3d 63, 72 (2d Cir.2003). Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III. *Limitations Period*

▮ Congress has set a one-year period of limitations for the filing of an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment. *See* 28 U.S.C. § 2244(d)(1). This limitations period ordinarily begins to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.* § 2244(d)(1)(A). A conviction becomes final for habeas purposes when the ninety-day period for filing a petition for a writ of certiorari to the United States Supreme Court has expired. *See McKinney v. Artuz,* 326 F.3d 87, 96 (2d Cir.2003); *see also* SUP. CT. R. 13.

Prisoners whose convictions became final before the effective date of AEDPA, April 24, 1996, had a grace period of one year, until April 24, 1997, to file their habeas applica-

tion. *See Ross v. Artuz*, 150 F.3d 97, 103 (2d Cir.1998).

■ "[T]he district court has the authority to raise a petitioner's apparent failure to comply with the AEDPA statute of limitation on its own motion." *Acosta v. Artuz*, 221 F.3d 117, 121 (2d Cir.2000). "If the court chooses to raise sua sponte the affirmative defense of failure to comply with the AEDPA statute of limitation, however, the court must provide the petitioner with notice and an opportunity to be heard before dismissing on such ground." *Id.*

■ In calculating the one-year limitation period, the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted...." 28 U.S.C. § 2244(d)(2). The "filing of creative, unrecognized motions for leave to appeal" does not toll the statute of limitations. *Adeline v. Stinson*, 206 F.3d 249, 253 (2d Cir.2000); *see also Artuz v. Bennett*, 531 U.S. 4, 8, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000) ("[A]n application is *'properly* filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee.... The question whether an application has been 'properly filed' is quite separate from the question whether the claims contained in the application are meritorious and free of procedural bar." (emphasis in original; footnote omitted)).

■ The term "pending" in the statute has been construed broadly to encompass all the time during which a state prisoner attempts, through proper use of state procedures, to exhaust state court remedies with regard to a particular post-conviction application. *See Bennett v. Artuz*, 199 F.3d 116, 120 (2d Cir.1999), *aff'd*, 531 U.S. 4, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000). "[A] state-court petition is 'pending' from the time it is first filed until finally disposed of and further appellate review is unavailable under the particular state's procedures." *Id.; see also*

*Carey v. Saffold*, 536 U.S. 214, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002) (holding that the term "pending" includes the intervals between a lower court decision and a filing in a higher court for motions for collateral review). A motion for extension of time to file an appeal does not toll AEDPA's limitations period unless an extension is actually granted. *See Bethea v. Girdich*, 293 F.3d 577, 579 (2d Cir.2002).

■ The period of limitations set forth in AEDPA ordinarily does not violate the Suspension Clause. *See Muniz v. United States*, 236 F.3d 122, 128 (2d Cir.2001) ("[T]he Suspension Clause does not always require that a first federal petition ... be decided on the merits and not barred procedurally." (internal quotation marks omitted)); *Rodriguez v. Artuz*, 990 F.Supp. 275, 283 (S.D.N.Y.1998) (concluding that AEDPA statute of limitations is not, "at least in general," an unconstitutional suspension of the writ).

■ A pro se litigant is accorded "some degree of latitude" in meeting filing requirements. *Brown v. Superintendent*, No. 97 Civ. 3303, 1998 WL 75686, at *4 (S.D.N.Y. Feb.23, 1998). But "[it] has long been recognized that ignorance does not excuse lack of compliance with the law." *Velasquez v. United States*, 4 F.Supp.2d 331, 334–35 (S.D.N.Y.1998) (holding that Bureau of Prison's failure to notify prisoners regarding AEDPA's time limitation did not warrant acceptance of untimely petition); *see also Brown*, 1998 WL 75686, at *4 ("[A] self-serving statement that the litigant is ignorant of the law is not grounds for equitable tolling of a statute of limitations.")

■ The Supreme Court held in *Duncan v. Walker* that "an application for federal habeas corpus review is not an 'application for State post-conviction or other collateral review' within the meaning of 28 U.S.C. § 2244(d)(2)," and that therefore the section does "not toll the limitation period during the pendency of [a petitioner's] first federal habeas petition." 533 U.S. 167, 181–82, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001). *Duncan* reversed a case in this circuit which held to the contrary. *See Walker v. Artuz*, 208 F.3d 357, 361–62 (2d Cir.2000). Although the Su-

preme Court has now declared that AEDPA's one-year limitations period is not tolled during the pendency of a properly filed federal habeas petition, this statute of limitations is not jurisdictional and may be tolled equitably. *Smith v. McGinnis,* 208 F.3d 13, 17 (2d Cir.2000). "Equitable tolling ... is only appropriate in 'rare and exceptional circumstances.' To merit application of equitable tolling, the petitioner must demonstrate that he acted with 'reasonable diligence' during the period he wishes to have tolled, but that despite his efforts, extraordinary circumstances 'beyond his control' prevented successful filing during that time." *Smaldone v. Senkowski,* 273 F.3d 133, 138 (2d Cir.2001).

■ Although state prisoners are not entitled to counsel as of right in either New York state collateral or federal habeas corpus proceedings, the Court of Appeals for the Second Circuit has stated that "an attorney's conduct, if it is sufficiently egregious, may constitute the sort of 'extraordinary circumstances' that would justify the application of equitable tolling to the one–year limitations period of AEDPA." *Baldayaque v. United States,* 338 F.3d 145, 152 (2d Cir.2003); *compare Smaldone,* 273 F.3d at 138–39 (attorney calculation error does not justify equitable tolling).

■ Prisoners cannot circumvent the strict AEDPA limitations period by invoking the "relation back" doctrine by arguing that a new petition should be treated as having been filed on the same day as a first petition. As the court of appeals has explained,

> If [the limitations period] were interpreted as Petitioner argues, the result would be impractical. A habeas petitioner could file a non-exhausted application in federal court within the limitations period and suffer a dismissal without prejudice. He could then wait decades to exhaust his state court remedies and could also wait decades after exhausting his state remedies before returning to federal court to "continue" his federal remedy, without running afoul of the statute of limitations.

*Warren v. Garvin,* 219 F.3d 111, 114 (2d Cir.2000) (quoting *Graham v. Johnson,* 168 F.3d 762, 780 (5th Cir.1999)).

## IV. *Exhaustion*

■ In the past, a state prisoner's federal habeas petition had to be dismissed if the prisoner did not exhaust available state remedies as to any of his federal claims. *See Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). "This exhaustion requirement is ... grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson,* 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The exhaustion requirement requires the petitioner to have presented to the state court "both the factual and legal premises of the claim he asserts in federal court." *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir.1982) (en banc).

Pursuant to AEDPA, a district court may now, in its discretion, *deny* on the merits habeas petitions containing unexhausted claims—so-called "mixed petitions." *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."). In addition, the state may waive the exhaustion requirement, but a "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." *Id.* § 2254(b)(3); *see also Ramos v. Keane,* No. 98 CIV. 1604, 2000 WL 12142, at *3–4, 2000 U.S. Dist. LEXIS 101, at *10 (S.D.N.Y. Jan 5, 2000) (state's failure to raise exhaustion requirement does not waive the issue).

## V. *Procedural Bar*

■ A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamen-

tal miscarriage of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546.

■ If a state court holding contains a plain statement that a claim is procedurally barred then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. *See Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (noting "a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision).

■ When a state court "says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved." *Glenn v. Bartlett,* 98 F.3d 721, 724–25 (2d Cir.1996). When a state court "uses language such as 'the defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 810 (2d Cir.2000). Where "a state court's ruling does not make clear whether a claim was rejected for procedural or substantive reasons and where the record does not otherwise preclude the possibility that the claim was denied on procedural grounds, AEDPA deference is not given, because we cannot say that the state court's decision was on the merits." *Su v. Filion,* 335 F.3d 119, 126 n. 3 (2d Cir.2003) (citing *Miranda v. Bennett,* 322 F.3d 171, 178 (2d Cir.2003)). This congeries of holdings leaves it an open question whether there are "situations in which, because of uncertainty as to what the state courts have held, no procedural bar exists and yet no AEDPA deference is required." *Id.*

## VI. *Actual Innocence*

■ "[A] habeas petitioner may also bypass the independent and adequate state ground bar by demonstrating a constitutional violation that resulted in a fundamental miscarriage of justice, *i.e.,* that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis,* 313 F.3d 724, 729 (2d Cir.2002).

Because habeas corpus "is, at its core, an equitable remedy," *Schlup v. Delo,* 513 U.S. 298, 319, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the Supreme Court has stated that "in appropriate cases, the principles of comity and finality that inform the concepts of cause and prejudice must yield to the imperative of correcting a fundamentally unjust incarceration," *id.* at 320–21, 115 S.Ct. 851 (internal quotation marks omitted). To ensure that this exception remains rare and will be applied only in the extraordinary case, the Court has "explicitly tied" the miscarriage of justice exception to the petitioner's innocence. *Id.* at 321, 115 S.Ct. 851. "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence ... that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Id.* at 324, 115 S.Ct. 851.

■ A showing of actual innocence serves merely as a gateway to the airing of the petitioner's defaulted claim and is not itself cognizable in habeas as a free-standing claim. *See Herrera v. Collins,* 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) ("[C]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."). A habeas court is, in short, concerned "'not [with] the petitioners' innocence or guilt but solely [with] the question whether their constitutional rights have been preserved.'" *Id.* (quoting *Moore v. Dempsey,* 261 U.S. 86, 87–88, 43 S.Ct. 265, 67 L.Ed. 543 (1923)); *cf. Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (holding that habeas court may review an *independent constitutional claim* that the evidence adduced at trial was insufficient to convict a criminal defendant beyond a reasonable doubt); *Thompson v. Louisville,* 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960) (reversing conviction of "Shuffling Sam" *on direct review* from conviction in Louisville's police court where there was no evidence that defendant violated city ordinances).

## VII. Ineffective Assistance of Counsel

 The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. CONST. amend. VI. This right to counsel is "the right to *effective* assistance of counsel." *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (emphasis added). The Supreme Court has explained that in giving meaning to this requirement we must be guided by its purpose—"to ensure a fair trial"—and that therefore the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail on a Sixth Amendment claim, a petitioner must prove both that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," *id.* at 688, 104 S.Ct. 2052, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. 2052; *see also Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *United States v. Eyman,* 313 F.3d 741, 743 (2d Cir.2002). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

 The performance and prejudice prongs of *Strickland* may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Id.* at 697, 104 S.Ct. 2052. In evaluating the prejudice suffered by a petitioner as a result of counsel's deficient performance, the court looks to the "cumulative weight of error" in order to determine whether the prejudice "reache[s] the constitutional threshold." *Lindstadt v. Keane,* 239 F.3d 191, 202 (2d Cir.2001). The court must also keep in mind that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland,* 466 U.S. at 696, 104 S.Ct. 2052. "The result of a [criminal] proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Purdy v. Zeldes,* 337 F.3d 253, 260 (2d Cir.2003) (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). Ineffective assistance may be demonstrated where counsel performs competently in some respects but not in others. *See Eze v. Senkowski,* 321 F.3d 110, 112 (2d Cir.2003).

 As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052. Counsel, in other words, "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. 2052. Where counsel fails to make a reasonable investigation that is reasonably necessary to the defense, a court must conclude that the decision not to call an expert cannot have been based on strategic considerations and will thus be subject to review under *Strickland*'s prejudice prong. *See Pavel v. Hollins,* 261 F.3d 210, 223 (2d Cir. 2001) (concluding that counsel was ineffective in a child sexual abuse case where his failure to call a medical expert was based on an insufficient investigation); *Lindstadt,* 239 F.3d at 201 (same). The Court of Appeals for the Second Circuit has recently gone so far as to imply that all of counsel's significant trial decisions must be justified by a sound strategy—a significant raising of the bar that would appear to require an unrealistic degree of perfection in counsel. *See Eze,* 321 F.3d at 136 (remanding to district court for factual hearing because it was "unable to assess with confidence whether strategic considerations accounted for ... counsel's decisions").

 There is "a strong presumption that counsel's conduct falls within the wide range

of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

■ Each factual claim made in support of an allegation of ineffective assistance of counsel must be fairly presented to a state court before a federal habeas court may rule upon it. *See Rodriguez v. Hoke,* 928 F.2d 534, 538 (2d Cir.1991) (dismissing petition as unexhausted where petitioner's claim of ineffective assistance of counsel alleged more deficiencies before the habeas court than were presented to the state court, because "[t]he state courts should have been given the opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole" (internal quotation marks omitted)). Where an additional factual claim in support of the ineffective-assistance allegation merely "supplements" the ineffectiveness claim and does not "fundamentally alter" it, dismissal is not required. *Caballero v. Keane,* 42 F.3d 738, 741 (2d Cir.1994). Each significant factual claim in support of an ineffective-assistance allegation premised on appellate counsel's deficient performance must be exhausted. *See Word v. Lord,* No. 00 CIV. 5510, 2002 WL 32145769, at *11–12, 2002 U.S. Dist. LEXIS 19923, at *34–*35 (S.D.N.Y. Mar. 18, 2002) (Magistrate's Report and Recommendation).

■ Although the *Strickland* test was formulated in the context of an ineffective assistance of trial counsel claim, the same test is used with respect to claims of ineffective appellate counsel. *See Claudio v. Scully,* 982 F.2d 798, 803 (2d Cir.1992). Appellate counsel does not have a duty to advance every nonfrivolous argument that could be made, *see Jones v. Barnes,* 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), but a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker," *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994). Either a federal or a state law claim that was improperly omitted from an appeal may form the basis for an ineffective assistance of appellate counsel claim, "so long as the failure to raise the state ... claim fell outside the wide range of professionally competent assistance." *Id.* (internal quotation marks omitted).

## VIII. *Errors of State Law*

■ Federal habeas corpus relief does not lie for mere errors of state law. *Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Nonetheless, the Due Process Clause requires that state courts conducting criminal trials "proceed consistently with 'that fundamental fairness' which is 'essential to the very concept of justice.'" *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir.1998) (quoting *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941)). Errors of state law that rise to the level of a constitutional violation may be corrected by a habeas court, but even an error of constitutional dimensions will merit habeas corpus relief only if it had a " 'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quotation omitted).

## IX. *Evidentiary Error*

■ For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial. *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The standard is "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short it must have been 'crucial, critical, highly significant.'" *Collins v. Scully,* 755 F.2d 16, 19 (2d Cir.1985) (quoting *Nettles v. Wainwright,* 677 F.2d 410, 414–15 (5th Cir.1982)). This test applies post-AEDPA. *See Wade v. Mantello,* 333 F.3d 51, 59 (2d Cir.2003).

## X. *Verdict Against the Weight of the Evidence*

■ To the degree petitioner claims that his guilt was not proven beyond a reasonable

doubt, the relevant question for this court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in a state criminal conviction. *Einaugler v. Supreme Court,* 109 F.3d 836, 840 (2d Cir.1997). To the degree petitioner claims the verdict was against the weight of the evidence, such a claim does not present a federal constitutional issue.

## XI. *Harmless Error*

 In order to be entitled to habeas relief, a petitioner must ordinarily demonstrate that any constitutional error "had substantial and injurious effect or influence in determining the jury's verdict," and that the error resulted in "actual prejudice." *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (internal quotation marks omitted).

When a claim was never adjudicated on the merits in the state courts and there is no ruling which commands AEDPA deference, it is unclear what the standard for review for harmlessness should be in a collateral attack when a federal court finds constitutional error. Should it proceed under the "beyond a reasonable doubt" standard of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (holding that conviction infected by constitutional error must be overturned unless "harmless beyond a reasonable doubt") or under the "substantial and injurious effect or influence" standard of *Brecht* (for cases on collateral review, an error is generally considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict")? The correct standard of review is an open question in this circuit. *See Cotto v. Herbert,* 331 F.3d 217, 253 (2d Cir.2003).

## XII. *Certificate of Appealability*

Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. *See* 28 U.S.C. § 2253; *Miller–El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). The court has taken into account the rule of section 2253(c)(3) of title 28 of the United States Code that a certificate of appealability "shall indicate which specific issue or issues satisfy the [substantial showing of the denial of a constitutional right] required by paragraph (2)." *See also Shabazz v. Artuz,* 336 F.3d 154 (2d Cir.2003).

This opinion complies with *Miranda v. Bennett,* 322 F.3d 171, 175–77 (2d Cir.2003), and Rule 52 of the Federal Rules of Civil Procedure. No other issue open to consideration by this court has merit. *See Sumner v. Mata,* 449 U.S. 539, 548, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) ("[A] court need not elaborate or give reasons for rejecting claims which it regards as frivolous or totally without merit.").

 A certificate of appealability may be granted with respect to any one of petitioner's claims only if petitioner can make a substantial showing of the denial of a constitutional right.

## XIII. *Analysis of Claims*

### A.

 Petitioner's current challenge to the prosecutor's summation is procedurally barred from *habeas* review because the state Appellate Division explicitly held—"defendant also failed to preserve for appellate review his contention [concerning the summation]"—that petitioner had not preserved that claim as a matter of law for its review. Because the court relied on an independent and adequate state procedural ground in rejecting the claim, this court will not entertain the claim. *See Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). That the Appellate Division found the claim to be without merit does not preclude barring the claim. *See Vargas v. Keane,* 86 F.3d 1273, 1280 (2d Cir.1996) (*habeas* summation claim procedurally barred where state appellate court found claim unpreserved and also without merit).

The claim is in any event without substance. The argument was responsive to that of petitioner. Where it was inappropri-

ate and objection was made, the court cured the error promptly. No prejudice has been shown.

### B.

■ Petitioner claims that the People did not prove that his statements to the police were voluntarily made. He made this claim to the Appellate Division. In response, the People argued that the claim was unpreserved for that court's review and also without merit as it was not supported by the record. The Appellate Division did not explicitly address the claim in its affirmance.

Defendant bases this claim on the contention that the detective used improper deceptive and psychologically coercive practices in order to obtain the statements. Defendant did not raise any claim, on any ground, concerning the voluntariness of the statements at trial. He did not raise it in his motions to dismiss (Tr. at 179).

The trial court instructed the jury on the determination of the voluntariness of defendant's statements, and defendant did not except to that charge. As a result, this claim has not been preserved for review. *See* N.Y.CRIM. PROC. LAW § 470.05(2); *People v. Piro*, 121 A.D.2d 748, 504 N.Y.S.2d 163 (App. Div.2d Dep't 1986) (finding voluntariness claim not preserved where only challenge to statement of defendant was on different ground).

First, defendant alleges that the police investigation was inadequate and allowed to falter for two years, and that defendant was only targeted in an effort to close the case, despite the fact that the police allegedly had no evidence. Defendant asserts that the police had no evidence, but acted on a "mere hunch" that defendant was the killer. The detective stated that he had no more leads until he spoke to a member of the family. Detective Maher was not asked, and he did not explain what the content of that conversation was, but it is not unlikely that the family member had some reliable information about defendant's involvement. Because there is no more about it on the record, the quality and degree of the police investigation and the underlying evidence that they had

that led them to suspect defendant, cannot be challenged in this forum.

Defendant argues that Detective Maher obtained his statements by "deception and implied promises" (Def.'s Br. at 23) and lies (*id.* at 29). There is nothing in the record to support these characterizations of the detective's testimony beyond normal and generally accepted practice in interrogations.

Defendant bases his argument on two portions of Detective Maher's testimony at trial. The actual facts, as they appear on the record, are as follows. In the first portion of the testimony to which defendant refers, Detective Maher testified that he had initially interviewed two possible suspects, both of whom he then ruled out. The first was a co-worker who had socialized with the victim in Manhattan that night, then went home to New Jersey, where his presence was confirmed by local police (Tr. at 72). Defendant's challenge to this testimony has no legal or factual basis. He simply concludes that the detective's decision that this person was not a likely suspect was unfounded. None of this testimony was contradicted or impeached at trial, no evidence was presented that established that the police investigation was incomplete, or that any other person had committed this crime. There is nothing in the record to support defendant's conclusory allegation that this co-worker might have been the actual murderer.

The second possible suspect initially interviewed by Detective Maher was a neighbor in the victim's building, Gordon Terford. Detective Maher testified that this man had a drug problem and a prior conviction for attempted rape. The detective said that this man "was alibied up as to his whereabouts at the time," because he was working, and so he was ruled out as a suspect (*Id.* at 73). Subsequently, on cross-examination, defense counsel asked the detective, "where was Mr. Terford, according to you confirming his alibi, during the time that Miss Cassandra June was killed?" (*Id. at* 100). After referring to this DD-5 for this man, as defense counsel had suggested earlier that he do (*id. at* 98), he testified that the suspect had been home alone, drinking and smoking pot (*Id. at* 100–01). The detective also then acknowledged

that this was not an "alibi" (*Id.* at 101). He testified, again on cross-examination, that the police had no evidence against this man (*Id.* at 98). As with the co-worker, no evidence was presented at trial that this man, or any other person other than defendant had killed Cassandra June. Defendant failed to establish police misconduct that resulted in a false confession.

In the second portion of testimony relied on by defendant, Detective Maher testified that after his initial investigation of the murder, in May, 1995, the leads went cold and that he had "nothing to go on" (*Id.* at 74). Nine months later, after speaking to the victim's brother, who was defendant's nephew, Detective Maher focused on finding and talking to defendant, whom he located and spoke to in July, 1997. Defendant was given *Miranda* rights (the proprietary of which defendant does not challenge) and defendant at first denied any involvement. The detective then told defendant that both he and defendant's family believed that defendant had killed his niece, Cassandra June. Detective Maher told defendant that he believed the family needed "closure," that they would forgive defendant "eventually" (*Id.* at 81–82), and that they would support him if he attempted to enter drug rehabilitation (*Id.* at 104). Defendant then made his confessional oral and videotaped statements.

In his cross-examination, Detective Maher said that he had "bluffed" defendant with his comments about defendant's family (*Id.* at 105), but he did not feel that he had scared defendant into making a false confession just so his family could have "closure" (*Id.*). The detective gave no further explanation of his "bluff."

Defendant claims that this "bluff" was the equivalent of an implied promise to defendant that he would receive drug treatment in lieu of jail once he was, inevitably, convicted. There is no basis in the record for this conclusion.

Even if the detective's statement that he had bluffed defendant did encourage defendant to make his statements, it was not itself necessarily improper. The use of some forms of deception and trickery by the police need not result in involuntariness without some showing that the deception was so fundamentally unfair as to deny due process. This non-threatening appeal to family, even if considered guile or a trick, may or may not constitute a denial of due process. It was arguably not the type of behavior that overbears the will.

This claim is somewhat disquieting. It may be that counsel failed in not moving more strenuously to suppress the confession of defendant, particularly with the aid of expert testimony in light of his apparent reduced capacity. It is not appropriate for this court to rule on the matter now since the state court has not ruled on it. Petitioner will have to move quickly in the state trial court to obtain whatever remedy is still available to him. He must return promptly to this court when state proceedings are completed.

## C.

■■■ Guilt of Murder in the Second Degree was proved by legally sufficient evidence. The element of depraved indifference to human life was proved. This contention has not been preserved for this court's review because defendant never made this specific claim to the trial court. In his motion to dismiss the case after all of the evidence, counsel said only that the People did not establish either of the counts beyond a reasonable doubt as a matter of law (Tr. at 179). Regarding the depraved mind element, counsel said only, "I will rely on the record in terms of the depraved indifference charge" (*Id.*). The court responded that it appeared that the elements had been established, and asked counsel to point out anything the court might have "missed" (*Id.*). Counsel said only that he was "relying on the record" (*Id.* at 180). Because defendant did not raise the specific claim or argument in the trial court that he raises on appeal, he has not preserved it for review. *See* N.Y. CRIM. PROC. LAW § 470.05(2); *People v. Brown*, 270 A.D.2d 496, 705 N.Y.S.2d 300 (App. Div.2d Dep't 2000); *People v. Dellemand*, 205 A.D.2d 551, 613 N.Y.S.2d 195 (App. Div.2d Dep't 1994).

 In any event, the claim is without merit. The evidence admitted at trial was legally sufficient to prove beyond a reasonable doubt that defendant was guilty of this crime for causing the death of Cassandra June by strangling her with his hands. The verdict was not against the weight of the evidence. *See* N.Y.CRIM. PROC. LAW § 470.15(5).

This possible claim has no merit.

### D.

No other possible claim appears at this time to be more than frivolous.

### XIV. *Conclusion*

Those possible claims not discussed in this memorandum are frivolous.

The petition for a writ of habeas corpus is stayed. The clerk will treat it as administratively closed. It may be reinstated on motion of either party. This court remains somewhat dubious about whether the claim of voluntariness has been adequately pressed in state court by petitioner or his counsel. Petitioner must proceed promptly in the state courts and this court to avoid the bar of the federal statute of limitations in habeas corpus proceedings.

SO ORDERED.